# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY,<br><br>        Defendant,<br><br>and<br><br>LAKE CARRIERS' ASSOCIATION and<br>CANADIAN SHIPOWNERS ASSOCIATION,<br><br>        Intervenor-Defendants. | Civil Action No. 1:13-cv-00617 (CKK) |

## INTERVENOR-DEFENDANTS LAKE CARRIERS' ASSOCIATION
## AND CANADIAN SHIPOWNERS ASSOCIATION'S
## STATEMENT OF POINTS AND AUTHORITIES
## IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR
## A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

I.    Statutory and Regulatory Framework ...........................................................2

      A.    Water Quality Standards ......................................................................2

      B.    Effluent Limits .....................................................................................4

      C.    Regulation of Ballast Water ................................................................5

II.   Relevant Procedural History .........................................................................6

      A.    New York Issues Its 401 Certification ................................................8

      B.    National Wildlife Federation Challenges the 401 Certification..............10

      C.    EPA Issues the 2013 Vessel General Permit .....................................10

ARGUMENT ......................................................................................................12

I.    Legal Standard ..............................................................................................12

II.   Plaintiff Fails To Meet Its Burden To Justify Preliminary Injunctive Relief.....................15

      A.    Plaintiff Is Unlikely To Succeed on The Merits ................................15

            1.    Plaintiff's Claim Is Not Ripe ....................................................16

            2.    Even If Plaintiff's Claim Was Ripe, It Is Time-Barred.............18

            3.    The Regulation Is a Reasonable Application of the Clean Water Act........................................................................................21

      B.    Plaintiff Will Not Suffer Irreparable Harm in the Absence of Preliminary Relief.........................................................................23

            1.    Dismissal of *National Wildlife Federation v. Martens* Does Not Constitute Irreparable Harm.................................................24

            2.    Speculation Regarding Aquatic Invasive Species Does Not Constitute an Imminent or Actual Harm.....................................24

      C.    The Balance of Equities Does Not Favor Plaintiff ............................27

          1.      The State of New York Has Issued Its 401 Certification and Conditions ...................................................................................................28

          2.      An Injunction May Cause Significant Economic Harm................................28

    D.      The Public Interest Would Not Be Served By An Injunction ...................................30

III.    If the Court Grants Plaintiff's Request For An Injunction, Plaintiff Must Post a Substantial Bond as a Condition of Any Injunction....................................................32

CONCLUSION ........................................................................................................................35

# TABLE OF AUTHORITIES

PAGE(S)

## REGULATIONS

76 Fed. Reg. at 76, 716 ................................................................................................ 26

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
38 F. Supp. 2d 114 (D.D.C. 1999) .......................................................................... 12, 13

*Am. Iron & Steel Inst. v. EPA*,
115 F.3d 979 (D.C. Cir. 1997) ................................................................................ 20, 22

*Am. Paper Inst., Inc. v. EPA*, 996 F.2d 346, 349 (D.C. Cir. 1993) ................................. 3

*American Paper Institute, Inc. v. EPA,* 996 F.2d 346 (D.C. Cir. 1993) ....................... 21

*Amoco Prod. Co. v. Vill. of Gamble*,
480 U.S. 531 (1987) ................................................................................................ 12, 13

*Anacosta Riverkeeper, Inc. v. Jackson*,
798 F. Supp. 2d 210, 245 (D.C. Cir. 2011) .................................................................. 22

*Bannum, Inc. v. Sawyer*,
251 F. Supp. 2d 7 (D.D.C. 2003) .................................................................................. 19

*Benten v. Kessler,*
505 U.S. 1084 (1992) .................................................................................................... 13

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451
F.3d 77, 85 (2d Cir. 2006)............................................................................................... 4

*Cellular Telecomm. & Internet Ass'n v. F.C.C.*,
330 F.3d 502 (D.C. Cir. 2003) ..................................................................................... 18

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ..................................................................................... 23

*Chevron U.S.A. Inc. v. NRDC*,
467 U.S. 837 (1984)....................................................................................................... 21

*Citizens Coal Council v. EPA*, 447 F.3d 879, 895-96 (6th Cir. 2006)............................ 5

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
58 F.3d 738 (D.C. Cir. 1995) ....................................................................................... 13

*Coal for Parity, Inc. v. Sebelius*,
709 F. Supp. 2d 6  (D.D.C. 2010) ......................................................................... 14

*Coalition for Common Sense in Gov't Procurement v. United States*,
576 F. Supp. 2d 162 (D.D.C. 2008) ...................................................................... 13

*Danforth v. Minnesota*,
552 U.S. 264 (2008) ............................................................................................. 14

*Davenport v. Int'l Bhd. of Teamsters*,
166 F.3d 356 (D.D.C. 1999) ................................................................................. 14

*Davis v. Pension Benefit Guaranty Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ........................................................................... 14

*Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*,
412 F.2d 165 (D.C. Cir. 1969) .............................................................................. 27

*Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*,
112 F.3d 1283 (5th Cir. 1997) .............................................................................. 19

*Evans v. United States*,
504 U.S. 255 (1992) ............................................................................................. 15

*Flynt v. Rumsfeld*,
355 F.3d 697 (D.C. Cir. 2004) .............................................................................. 18

*Hi-Tech Pharmacal Co. v. FDA*,
587 F. Supp. 2d 1 (D.D.C. 2008) ......................................................................... 13

*I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
 502 U.S. 183 (1991) ............................................................................................ 19

*In Habitat Educ. Ctr. v. U.S. Forest Serv.*,
 607 F.3d 453 (7th Cir. 2010) ............................................................................... 33

*Lake Erie Alliance for the Prot. of the Coastal Corridor v. U.S. Army Corps of
Eng'rs*, 526 F. Supp. 1063, 1074 (W.D. Pa. 1981), *aff'd*, 707 F.2d 1392 (3d Cir.
1981) ...................................................................................................................... 4

*Los Angeles v. Lyons*,
461 U.S. 95 (1983) ............................................................................................... 13

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ............................................................................................. 19

*Maitland v. Trojan Elec. & Mach. Co.*,
480 N.E.2d 736 (N.Y. 1985) ................................................................................ 24

*Malcolm v. Reno*,
129 F. Supp. 2d 1 (D.D.C. 2000) ....................................................................................... 33, 34

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)................................................................................................................ 15

*Mobil Oil Corp. v. Kelley*, 426 F. Supp. 230, 234-35 (S.D. Ala. 1976) ........................................ 4

*Munaf v. Green*, 553 U.S. 674, 689-90 (2008) ........................................................................... 12

*N. Slope Borough v. Andrus*,
486 F. Supp. 326 (D.D.C. 1979) .......................................................................................... 26

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
489 F.3d 1221 (D.C. Cir. 2007)............................................................................................ 22

*Nat'l Kidney Patients Ass'n v. Sullivan*,
958 F.2d 1127 (D.C. Cir. 1992) ...................................................................................... 33, 34

*Nat'l Pork Producers Council v. EPA*,
635 F.3d 738 (5th Cir. 2011) ................................................................................................ 21

*NRDC. v. EPA*,
822 F.2d 104 (D.C. Cir. 1987) .......................................................................................... 2, 22

*P & V Enterprises v. U.S. Army Corps of Engr's*,
466 F. Supp. 2d 134 (D.D.C. 2006) *aff'd*, 516 F.3d 1021 (D.C. Cir. 2008) ................................ 18

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
575 F.3d 342 (4th Cir. 2009) ................................................................................................ 15

*Selkirk Conservation Alliance v. Forsgren*, No. CV 01-1511-PA (D. Or. Sept. 17,
2002) ...................................................................................................................................... 34

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ........................................................................................ 12, 14

*Simms v. Dist. of Columbia*,
872 F. Supp. 2d 90 (D.D.C. 2012) ....................................................................................... 34

*Titan Tire Corp. v. Case New Holland, Inc.*,
566 F.3d 1372 (Fed. Cir. 2009)............................................................................................ 15

*United States v. Aguon*,
851 F.2d 1158 (9th Cir. 1988) .............................................................................................. 14

*Village of Gambell*, 480 U.S. at 541-42 ...................................................................................... 27

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982) ................................................................................................ 13

*Winter v. NRDC,* 555 U.S. 7, 20 (2008) ........................................................... passim

*Woodstream Corp. v. Jackson,*
No. 11-367, 2011 WL 8883395 (D.C. Cir. June 3, 2011) ........................................ 12

## CASES

*Farkas v. N.Y. State Dep't of Civil Serv.,*
494 N.Y.S.2d 178 (N.Y. App. Div. 1985) ................................................................ 24

*Matter of Meegan S. v. Donald T.,*
475 N.E. 449 (N.Y. 1984) ........................................................................................ 24

*Nw. Envtl. Advocates v. U.S. EPA,* No. C03-05760, 2006 WL 2669042 (N.D. Cal.
Sept. 18, 2006), *aff'd,* 537 F.3d 1006 (9th Cir. 2008) ............................................. 6

*Port of Oswego Auth. v. Grannis,*
897 N.Y.S.2d 736 (App. Div. 2010) .......................................................................... 3

*Utahns for Better Transp. v. U.S. Dep't of Transp.,*
Nos. 01-4216, 01-4217, 01-4220 (N.D. Utah Nov. 21, 2001) ................................. 34

## OTHER AUTHORITIES

33 C.F.R. §§ 151.1500-1518 ...................................................................................... 5

33 C.F.R. §§ 2000-2080 .............................................................................................. 5

33 U.S.C. § 1313 ......................................................................................................... 3

33 U.S.C. § 1341 ........................................................................................... 3, 4, 6, 16

33 U.S.C. § 1342 ...................................................................................................... 2, 4

40 C.F.R. § 122.3(a) ................................................................................................... 6

40 C.F.R. § 122.4 ....................................................................................................... 4

40 C.F.R. § 122.44 ........................................................................................ 3, 4, 5, 25

40 C.F.R. § 122.44(k) ................................................................................................. 9

40 C.F.R. § 124.53 ......................................................................................................... 3

40 C.F.R. § 131.4 ........................................................................................................... 3

40 C.F.R. § 144 ............................................................................................................... 5

73 Fed. Reg. 79,493 (Dec. 29, 2008). ........................................................................... 6

**TREATISES**

28 U.S.C. § 2401(a) ...................................................................................................... 20

33 U.S.C. § 1328(a) ........................................................................................................ 2

33 U.S.C. § 1341(d) ...................................................................................................... 21

33 U.S.C. § 1342(a) ................................................................................................... 2, 30

33 U.S.C. § 1342(k) ............................................................................................. 2, 22, 31

33 U.S.C. § 1344(a) ........................................................................................................ 2

33 U.S.C. § 1344(p) ................................................................................................... 2, 22

33 U.S.C. § 1369(b)(1) ................................................................................................. 20

33 U.S.C. §§ 1311(a) ................................................................................................. 2, 30

40 C.F.R. § 122.44(d). ................................................................................................... 25

40 C.F.R. § 124.55(b) ............................................................................................. passim

40 C.F.R. § 23.2(a) ........................................................................................................ 10

40 C.F.R. §§ 124.53(e) .................................................................................................... 4

40 C.F.R. §§ 124.53(e)(1) ............................................................................................... 5

44 Fed. Reg. 32,854, 32,869 (June 7, 1979) .................................................................. 2

45 Fed. Reg. 33,290 (May 19, 1980) ............................................................................ 19

49 Fed. Reg. 37,998, 38,045 (Sept. 26, 1984) ............................................................... 2

5 U.S.C. §§ 701-706 ...................................................................................................... 16

6 NYCRR § 608.9 ........................................................................................................... 5

65 Fed. Reg. 30,886, 30,912 (May 15, 2000) ................................................................ 19

78 Fed. Reg. 21,938 ...................................................................................................... 22

Fed. R. Civ. P. 12(b)(1)................................................................................................. 16

Fed. R. Civ. P. 65(c). ............................................................................................... 32, 33

Fed. Reg. 14,146, 14,264 (April 1, 1983) .................................................................... 19

Fed. Reg. 14,274-75 (April 1, 1983)............................................................................ 19

## INTRODUCTION

At the end of October 2012, Plaintiff National Wildlife Federation ("NWF") brought suit against the state of New York, alleging that New York was required to add new conditions to the U.S. Environmental Protection Agency's ("EPA") then-proposed Vessel General Permit ("VGP"), which regulates, among other things, discharges of ballast water into the Great Lakes. On April 12, 2013, EPA published the 2013 VGP in the Federal Register.  Pursuant to 40 C.F.R. § 124.55(b), new conditions can no longer be added to the VGP, and therefore NWF's claims against New York are moot.

NWF has now brought this suit against EPA in an effort to revive its litigation against the state of New York.  NWF asks this Court to strike down 40 C.F.R. § 124.55(b), alleging that the 33-year old regulation violates the Clean Water Act.  NWF has also sought a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI"), claiming to protect the authority of New York to make its own decisions about the VGP.

NWF's claims are without merit and its motions for a TRO and PI should be denied. Preliminary injunctive relief is an extraordinary measure with extraordinary hurdles of persuasion.  As will be explained, NWF has no likelihood of success on the merits because this is a facial challenge that has long since been time-barred, fails to state a claim and is not ripe. NWF's claims to irreparable harm are entirely hypothetical, and NWF cannot possibly suffer any in the absence of preliminary relief because the VGP does not go into effect for over seven months.  The balance of equities also disfavors NWF, and the public interest is not served by preliminary injunctive relief, because New York has already acted, preliminary relief may cause severe economic hardship, and overturning the regulation would throw federal permitting programs into disarray.

1

## BACKGROUND

### I.     STATUTORY AND REGULATORY FRAMEWORK

The Clean Water Act ("CWA")'s conceptual foundation is its sweeping premise that any discharge of pollutants from point sources to navigable waters is unlawful, unless made pursuant to a permit that incorporates conditions and limitations imposed by CWA Sections 301, 302, 306 and 307, 33 U.S.C. §§ 1311, 1312, 1316, 1317.  *See* 33 U.S.C. §§ 1311(a), 1342(a), 1344(a) and 1328(a).  Most discharges are permitted under the National Pollution Discharge Elimination System ("NPDES").  33 U.S.C. § 1342.  Once issued, a permit establishes definitively the CWA requirements applicable to the covered activity for the term of the permit. By complying with its permit, the permit holder complies with the CWA.  33 U.S.C. § 1342(k); 33 U.S.C. § 1344(p); *NRDC. v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987).

CWA permits remain the law as to the covered discharges even if regulatory standards later change.  "In general, permits are not modified to incorporate changes made in regulations during the term of the permit.  This is to provide some measure of certainty to both the permittees and the Agency during the term of the permits."  NPDES Permit Regulations, 49 Fed. Reg. 37,998, 38,045 (Sept. 26, 1984).  Thus, "permit terms and conditions remain enforceable unless and until they are modified, revoked, or judicially or administratively stayed."  NPDES; Revision of Regulations, 44 Fed. Reg. 32,854, 32,869 (June 7, 1979).  EPA itself has cautioned that "any attempt to apply limitations or standards which were not in effect at the time of permit issuance constitutes unauthorized overreaching by the permit issuing authority."  *Id.*

#### A.     Water Quality Standards

Water quality standards form the backbone of the NPDES permitting process.  Section 303 of the CWA empowers the states to establish and enforce water quality standards for waters

2

within the state.  *See* 33 U.S.C. § 1313.  Congress gave states the primary authority to develop, review and periodically revise these water quality standards, and once approved by EPA, they are considered the "applicable" standards in the state.  33 U.S.C. § 1313; 40 C.F.R. § 131.4.

In general, there are two types of water quality standards.  Numeric standards limit the amount of specified contaminants and are expressed as specific numeric limitations (*e.g.,* "no more than 5 mg/l chlorine").  Narrative standards, by contrast, are a textual standard (*e.g.,* "the ecosystem shall not be degraded").  Unlike numeric standards, narrative standards are inherently subjective, and require interpretation by the relevant state.  *See* 40 C.F.R. § 122.44(d)(1)(vi); *see also* 6 NYCRR §§ 702.16(a)-(b), 703.2, 750-1.11(a)(5).  A state's interpretation of its narrative standards trumps any competing federal interpretation, so long as the state's interpretation is supported by substantial evidence.  *Am. Paper Inst., Inc. v. EPA*, 996 F.2d 346, 349 (D.C. Cir. 1993).

Before EPA issues a permit (or any federal agency issuing a federal permit that may impact state waters) each impacted state still retains the primary authority to determine compliance with its water quality standards.  CWA Section 401 requires EPA or any other federal agency issuing a permit to obtain a 401 certification from the state, determining that the discharges at issue will comply with the state's water quality standards.  33 U.S.C. § 1341; *Port of Oswego Auth. v. Grannis*, 897 N.Y.S.2d 736, 738 (App. Div. 2010) ("The Clean Water Act specifically permits a state to add conditions to its VGP certification that set forth additional limitations and restrictions to ensure that federal permittees will comply with the Act as well as the applicable state laws."); 40 C.F.R. §§ 122.4(b), 124.53(a), (e); *see also* 6 NYCRR § 608.7-9. Having vested states with the primary authority to develop water quality standards, Congress also provided the states with the primary authority to certify whether federal permitting decisions

are consistent with those standards.  *See* 33 U.S.C. § 1341; *Mobil Oil Corp. v. Kelley*, 426 F.

Supp. 230, 234-35 (S.D. Ala. 1976) ("[C]ertification under Section 401 is set up as an exclusive

prerogative of the state . . . ."); *see also Lake Erie Alliance for the Prot. of the Coastal Corridor

v. U.S. Army Corps of Eng'rs*, 526 F. Supp. 1063, 1074 (W.D. Pa. 1981), *aff'd*, 707 F.2d 1392

(3d Cir. 1981) (unpublished).

A certifying state must ensure that the permit complies with the state's water quality

standards.  33 U.S.C. § 1341(a); 40 C.F.R. §§ 124.53(e).  To ensure that the permit complies

with the water quality standards, the state assesses the need for applicable conditions, including

technology-based effluent limits, water quality-based effluent limits, best management practices,

monitoring requirements, and other conditions.  33 U.S.C. § 1341(d); 40 C.F.R. §§ 124.53(e);

122.44(a)(1), (d)(1), (i)(1), (k)(3).

## B.      Effluent Limits

The first type of permit conditions, technology-based effluent limits ("TBELs"), represent

the greatest pollutant reductions that are economically achievable.  *See Catskill Mountains

Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77, 85 (2d Cir. 2006).  If

imposed, a NPDES permit will establish permit conditions based on the performance of that best

available technology.  *See* 40 C.F.R. § 122.44(a)(1); 6 NYCRR §§ 750-1.11, 1.24.  The second

type of effluent limits, water quality-based effluent limits ("WQBELs"), are measures that the

certifying state determines are necessary to ensure compliance with a numeric or narrative water

quality standard.  *See Catskill Mountains Chapter*, 451 F.3d at 85 n.9; 40 C.F.R. §§ 124.53(e); 6

NYCRR §§ 608.9, 750-1.11.   Both types of effluent limits may be expressed through numeric

limits or through other means.  *See Citizens Coal Council v. EPA*, 447 F.3d 879, 895-96 (6th Cir.

2006) (holding that effluent limitations may be non-numeric when numeric limitations are infeasible); 40 C.F.R. § 122.44; 6 NYCRR §§ 750-1.11, 1.24.

A state may also require best management practices ("BMPs"), monitoring requirements, or other conditions the state deems necessary to ensure compliance with the CWA and the state's water quality standards.  *See* 40 C.F.R. §§ 124.53(e); 40 C.F.R. § 144(i), (k); 6 NYCRR §§ 608.9, 750-1.11.   In particular, BMPs and other narrative WQBELs may be required where numeric WQBELs are determined to be "infeasible."  *See* 40 C.F.R. § 122.44(k); 6 NYCRR §§ 608.9, 750-1.11; *In re Gov't of D.C. Mun. Separate Storm Sewer Sys.*, 10 E.A.D. 323, 336-37 (EAB 2002) (explaining that BMPs are a form of effluent limitation and may be used to satisfy water quality based requirements).   A state may only issue a 401 certification if these limits and conditions will "assure compliance with the applicable provisions of CWA sections 208(e), 301, 302, 303, 306, and 307 and with appropriate requirements of State law."  40 C.F.R. §§ 124.53(e)(1); *see* 6 NYCRR § 608.9.

### C.    Regulation of Ballast Water

Ballast water discharges from vessels, in the Great Lakes and elsewhere, have long been subject to extensive regulation.  The Coast Guard requires vessels to implement a ballast water management system, and requires numeric TBELs, BMPs, exchange and flushing requirements for oceangoing vessels, and monitoring and reporting.  *See* 33 C.F.R. §§ 151.1500-1518, 2000-2080.  The numeric TBELs imposed by the Coast Guard regulations are derived from the biological treatment standards developed by the International Maritime Organization ("IMO"). *Id.* § 151.1511.  These standards limit the number of biological organisms that a ship may discharge, based on the type and size of the organisms.  *Id.*

EPA's regulations previously excluded ballast water from the CWA requirement to obtain a NPDES permit. *See* 40 C.F.R. § 122.3(a). In 2006, however, the U.S. District Court for the Northern District of California vacated this exclusion. *Nw. Envtl. Advocates v. EPA*, No. C03-05760, 2006 WL 2669042 (N.D. Cal. Sept. 18, 2006), *aff'd*, 537 F.3d 1006 (9th Cir. 2008). Once this ruling went into effect, discharges of ballast water would have been prohibited without a NPDES permit. *See* 33 U.S.C. § 1311(a).

In response to this ruling, on December 19, 2008, EPA issued a Vessel General Permit ("VGP") applicable to all discharges incidental to the normal operation of vessels. 73 Fed. Reg. 79,493 (Dec. 29, 2008). Because this was a federal permit, EPA requested 401 certifications from all potentially impacted states. *See* 33 U.S.C. § 1341(a). As a result of these regulatory actions, the 2008 VGP currently governs ballast water discharges in New York, the other Great Lakes states, and all other jurisdictional waters of the United States.

## II.     RELEVANT PROCEDURAL HISTORY

In March 2009, Plaintiff NWF and other groups challenged the 2008 VGP in federal court. *See* Consolidation Order, Case No. 09-1089, Doc. #1170154 (D.C. Cir. March 16, 2009). The resulting 2011 settlement required EPA to issue a new VGP by November 30, 2012 that incorporated numeric TBELs for ballast water discharges, among other requirements (hereinafter, "2013 VGP"). Settlement Agreement, Case No. 09-1089, Doc. #1296922 at 4(D.C. Cir. March 8, 201).[1] Intervenor-Defendants Lake Carriers' Association ("LCA") and Canadian Shipowners Association ("CSA") submitted comments and participated in the development of the new 2013 VGP. Affidavit of James H. I. Weakley in Support of LCA and CSA's Motion to Intervene

---

[1] This settlement agreement is attached hereto as Exhibit 1.

6

(hereinafter "Weakley Aff.") ¶ 17; Affidavit of Robert Lewis-Manning in Support of LCA and

CSA's Motion to Intervene (hereinafter "Lewis-Manning Aff.") ¶ 7.[2]

Consistent with the settlement regarding the 2008 VGP, EPA and the Coast Guard

commissioned EPA's Science Advisory Board ("SAB") and the Water Science and Technology

Board of the National Research Council (which is within the National Academies of Science

("NAS")) to study and provide technical advice on the possibility of implementing numeric

limits to reduce the risk of invasive species. Ex. 1 at 2; Plaintiff's Statement of Points of Law

and Authority In Support of Its Motions for Temporary Restraining Order and Preliminary

Injunction ("Pl. Br.") Ex. 12 at 2 (Doc. 7-12).

On December 8, 2011, EPA issued the draft 2013 VGP. 76 Fed. Reg. 76,716-76,725

(Dec, 8, 2011); Pl. Br. Ex. 10 (Doc. 7-10). The draft 2013 VGP contained many new limitations,

including numeric TBELs consistent with the IMO standards, BMPs, exchange and flushing

requirements for oceangoing vessels, interim WQBELs, monitoring requirements, and additional

requirements for specific types of vessels. *See* Pl. Br. Ex. 10 at 2-19 (Doc. 7-10). EPA's

proposed 2013 VGP applies to all vessel discharges from all commercial and large recreational

vehicles, but excludes Lakers constructed before January 2009 from compliance with the

numeric TBELs for ballast water discharges. Pl. Br. Ex. 10 at 2, 14-15 (Doc. 7-10).

Pursuant to Clean Water Act Section 401, EPA asked the New York Department of

Environmental Conservation ("DEC") to certify that the proposed permit would comply with

---

[2] These affidavits were included as Exhibits B and C to LCA and CSA's Motion to Intervene in this case. LCA, CSA and their members have long been working to combat the threats posed by invasive species. For example, LCA and its members developed many of the best management practices that have been subsequently adopted by the EPA and many state regulatory agencies. *See* Pl. Br. Ex. 9 at 7 (Doc. 7-9) ("The BMPs in the WQC were taken directly from the Lake Carrier's Association [sic] published BMPs for the Great Lakes . . . .").

New York's water quality standards (hereinafter the "401 Certification"). Pl. Br. Ex. 7 at 1 (Doc. 7-7).[3] Consistent with the settlement over the 2008 VGP, EPA provided New York with at least 6 months to issue its 401 Certification. *See* Ex. 1 at 5; Pl. Br. at 12 ("nine months"). On May 16, 2012, DEC published a draft 401 Certification and gave public notice of an opportunity to submit comments. *See* Pl. Br. at 12. LCA and CSA timely submitted comments. Weakley Aff. ¶ 17; Lewis-Manning Aff. ¶ 7. Plaintiff, along with other advocacy groups, also submitted comments. *See* Pl. Br. at 12.

A.     **New York Issues Its 401 Certification**

On September 26, 2012, DEC issued its 401 Certification of the 2013 VGP, imposing additional conditions beyond the extensive limitations already incorporated in the 2013 VGP, so as to assure compliance with New York's water quality standards. Pl. Br. Ex. 7 at 3-6 (Doc. 7-7). In determining which effluent limits would ensure compliance with New York's water quality standards, DEC followed its regulations and relied on substantial evidence in the record, scientific findings, and technical expertise. *See* Weakley Aff. ¶ 16. These additional New York conditions include compliance with the proposed 2013 VGP, including the biological TBELs, exchange and flushing requirements for oceangoing vessels, a narrative WQBEL, specific BMPs for Lakers, monitoring requirements, and a prohibition on the discharge of bilge water. Pl. Br.

---

[3] All of the Great Lakes states have issued or waived their right to issue 401 Certifications. After Minnesota issued its 401 Certification, Plaintiff NWF and three other advocacy organizations brought suit in the Minnesota Court of Appeals. *See In re Decision on the Approval for Submittal of a 401 Water Quality Certification*, 822 N.W.2d 676, 677 (Minn. Ct. App. 2012). LCA was permitted to intervene as a respondent in that action. *Id.* Minnesota's 401 Certification contained nearly identical conditions to New York's, and NWF argued in Minnesota, as it has in New York, that Minnesota erred by excluding a numeric WQBEL. *Id.* at 687. On November 13, 2012, the Minnesota Court of Appeals affirmed the issuance of Minnesota's 401 certification and deferred to Minnesota Pollution Control Agency's expertise,

Ex. 7 at 3-6 (Doc. 7-7).  Pursuant to its statutory and regulatory responsibility, DEC expressly

found that each condition in the 401 Certification was "needed to assure compliance with the

relevant provisions of law and regulation."  Pl. Br. Ex. 7 at 2 (Doc. 7-7).

   The biological TBELs required in New York's 401 Certification are identical to those

required in the Coast Guard regulations, the 2013 VGP, and have been adopted from the

International Maritime Organization D-2 ballast water discharge limits ("IMO D-2"). Pl. Br. Ex.

10 at 5-14 (Doc. 7-10).

   DEC declined to impose a numeric WQBEL because "it is infeasible to calculate numeric

WQBELs for ballast water because 'at this time the lack of available data and information

prevents a precise quantification of the invasion risk associated with ballast water discharges.'"

Pl. Br. Ex. 8 at 9 (Doc. 7-8). This is the same conclusion reach by EPA and the National

Academies of Science in the in the 2013 VGP and NAS Report, respectively.  Pl. Br. Ex. 13 at 2,

7 (Doc. 7-13) (citing NAS Report); Pl. Br. at 40 (acknowledging the finding of the NAS report).

   DEC also included exchange and flushing requirements to the 401 Certification as an

"interim WQBEL that will be protective of state water quality until a numeric WQBEL is

developed and implemented."  Pl. Br. Ex. 8 at 9 (Doc. 7-8).  DEC concluded that additional

conditions were necessary to meet applicable water quality standards, so it imposed BMPs as

well. *Id.*  EPA also included BMPs in the 2013 VGP.  Pl. Br. Ex. 10 at 3-5 (Doc. 7-10).

Pursuant to referral regulations, until sufficient information is available to develop numeric

WQBELs, BMPs are an appropriate alternative to assure water quality standards are met. *See* 40

C.F.R. § 122.44(k) .  DEC also required compliance with additional conditions, like a prohibition

_____

holding that the agency did not err by concluding that a numeric WQBEL was not feasible. *Id.* at
687-88.

on the discharge of bilge water, all of which were supported by substantial evidence.  Pl. Br. Ex. 8 at 6-7 (Doc. 7-8).

### B.  National Wildlife Federation Challenges the 401 Certification

More than a month after New York issued its 401 Certification, NWF brought suit in New York state court, alleging that DEC committed errors of law and acted arbitrarily and capriciously in publishing the 401 Certification.  Verified Petition, *Nat'l Wildlife Fed'n v. Martens*, Index No. 6181-12 (N.Y. Sup. Ct. Oct. 29, 2012).  LCA and CSA sought to intervene in the case to protect the interests of their members, and were granted such intervention. Order on Stipulation Permitting Intervention of Lake Carriers' Ass'n & Canadian Shipowners Ass'n, *Nat'l Wildlife Fed'n v. Martens*, Index No. 6181-12 (N.Y. Sup. Ct. Nov. 28, 2012).

NWF alleged that a numeric WQBEL was legally required, and asked the New York court to order DEC to add a *numeric* WQBEL to the 401 Certification for all vessels, including Lakers.  *See* Pl. Br. at 13.  The State of New York and Intervenor-Defendants LCA and CSA opposed NWF's demand that DEC add additional conditions to the 401 Certification.  *See* Intervenor-Respondents' Memorandum of Law in Support of Their Verified Answer, *Nat'l Wildlife Fed'n v. Martens*, Index No. 6181-12 (N.Y. Sup. Ct. Jan. 23, 2013).  The New York court has not yet decided NWF's challenge to DEC's 401 Certification.

### C.  EPA Issues the 2013 Vessel General Permit

EPA published the VGP in the Federal Register on April 12, 2013. 78 Fed. Reg. 21,938 (April 12, 2013).  The VGP is now considered issued.  *See* 40 C.F.R. § 23.2(a).  Pursuant to 40 C.F.R. § 124.55(b), now that the VGP has been issued, no further conditions may be added to the 401 Certification.  As a result, *Nat'l Wildlife Fed'n v. Martens*, Index No. 6181-12 (N.Y. Sup. Ct.) is now moot.  *See In re U.S. E.P.A. Vessel General Permit for Discharges Incidental to*

*Normal Operation of Commercial Vessels*, 2009 WL 2998058 (Minn. App. 2009) (unpublished); Complaint at ¶ 31 (Doc. 1) ("[u]nless the Court prohibits EPA from applying [C.F.R. § 124.55(b)], the New York state court is substantially likely to dismiss *National Wildlife Federation v. Martens*").

Thereafter, counsel for Intervenor-Defendants LCA and CSA requested that NWF dismiss the New York case because NWF's requested relief could no longer be granted, but NWF refused. Instead, NWF sent a letter to the New York court on April 30, 2013, explaining that "NWF does not consider that this case will be moot as a result of the Regulation [40 C.F.R. § 124.55(b)]." Ltr. from Neil Kagan to Judge McNamara at 1 (April 30, 2013).[4] Pursuant to their obligation to notify the New York Court of changed circumstances relevant to the disposition of a pending matter, LCA and CSA notified the New York Supreme Court on April 30, 2013 that the VGP had been issued and the case was now moot. Pl. Br. Ex. 14 (Doc. 7-14).

On May 1, 2013, one day after telling the New York Court that it did not believe 40 C.F.R. § 124.55(b) rendered the action moot, NWF filed the instant action against EPA, seeking to overturn 40 C.F.R. § 124.55(b) because it would render NWF's case in New York moot. *See, e.g.*, Pl. Br. at 17 ("the New York court is substantially likely to conclude that it is compelled to acknowledge a federally-promulgated regulation and dismiss the case."); at 23 ("Delaying review is substantially likely to lead to the imminent dismissal of NWF's state lawsuit . . . "). NWF seeks a declaration that 40 C.F.R. § 124.55(b) is "in excess of EPA's statutory jurisdiction, authority, or limitations, or short of statutory right under the Clean Water Act." Complaint at 9 (Doc. 1). NWF also seeks an injunction prohibiting EPA from applying 40 C.F.R. § 124.55(b) to exclude conditions added after the issuance of the VGP. *Id.* Concurrently with the Complaint,

Plaintiff filed motions for a temporary restraining order and preliminary injunction to prevent

EPA from applying 40 C.F.R. § 124.55(b).  (Doc. 7, 8).

## ARGUMENT

Plaintiff's motions for preliminary injunctive relief should be denied.  Preliminary

injunctive relief is an extraordinary measure only awarded upon a clear showing that it is

justified.  Plaintiff cannot satisfy any of the factors used to demonstrate the need for preliminary

injunctive relief and has utterly failed to meet its burden.  Even if this Court were inclined to

grant such relief, Plaintiff should be required to post a substantial bond.

## I.    LEGAL STANDARD

This Court may issue preliminary injunctive relief only when the movant demonstrates

"[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the

absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

injunction is in the public interest."  *Winter v. NRDC*, 555 U.S. 7, 20 (2008) (citing *Munaf v.

Green*, 553 U.S. 674, 689-90 (2008)).  The same standard applies to both motions for a

temporary restraining order and preliminary injunction, and courts have used these four factors in

evaluating requests for injunctive relief in litigation under environmental laws, *see, e.g., Amoco

Prod. Co. v. Vill. of Gamble*, 480 U.S. 531, 542 (1987), as well as litigation seeking to prevent

enforcement of agencies' interpretations of statutes, *see, e.g., Sherley v. Sebelius*, 644 F.3d 388,

392 (D.C. Cir. 2011); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 120-

21 (D.D.C. 1999); *Woodstream Corp. v. Jackson*, No. 11-367, 2011 WL 8883395, at *3 (D.C.

Cir. June 3, 2011).

---

[4] This letter is attached hereto as Exhibit 2.

It is particularly important for the movant to demonstrate a likelihood of success on the merits. *Cf. Benten v. Kessler,* 505 U.S. 1084, 1085 (1992) (per curiam).  Absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review."  *Am. Bankers Ass'n,* 38 F. Supp.2d at 140 (internal quotation omitted).

The other critical factor in the injunctive relief analysis is irreparable injury.  A movant must "demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis in original) (citing *Los Angeles v. Lyons,* 461 U.S. 95, 103 (1983)).  Indeed, if a party fails to make a sufficient showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors.  *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995).  The irreparable injury requirement "erects a very high bar for a movant."  *Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008).  "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is 'more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'"  *Hi-Tech Pharmacal Co. v. FDA,* 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (quoting *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

If the plaintiff can demonstrate a likelihood of success on the merits and irreparable injury, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co.,* 480 U.S. at 542.  "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982).

The Supreme Court's decision in *Winter* made clear that these factors are not to be balanced against one another, but that *each* of the four factors must be met before any injunction may issue. Thus, upon concluding that the public interest weighed against an injunction that would constrain the Navy's training exercises, the Court held in *Winter* that this finding "alone require[d] denial of the requested injunctive relief" regardless of whether the other factors might have supported an injunction. 555 U.S. at 23.

Before *Winter*, the D.C. Circuit evaluated these factors on a "sliding scale," allowing a strong showing on one factor to make up for a weaker showing on another. *Sherley*, 644 F.3d at 392 (citing *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360-61 (D.D.C. 1999)). The Supreme Court's decision in *Winter*, however, has caused the D.C. Circuit to reconsider the "sliding scale" approach and instead favor a more demanding burden. *Id.* at 392. Regarding the first two factors in particular, the D.C. Circuit has interpreted *Winter* "to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction,'" *id.* at 393 (quoting *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (concurring opinion)), and that irreparable injury must be likely, "not just a possibility." *Davis*, 571 F.3d at 1292 (quoting *Winter*, 555 U.S. at 21-22).

NWF nonetheless urges consideration of its motions according to a sliding scale, citing *Davis*, 571 F.3d at 1292 and *Coal for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 6, 8 (D.D.C. 2010). Pl. Br. at 30. As explained above, the D.C. Circuit has since moved away from this sliding scale. More importantly, this sliding scale approach is not permitted under *Winter*, and the Supreme Court is the "final arbiter of federal law."[5] Plaintiff therefore may not rely on *Davis*

---

[5] *Danforth v. Minnesota*, 552 U.S. 264, 291-92 (2008) (Roberts, J., dissenting); *see also United States v. Aguon*, 851 F.2d 1158, 1173 (9th Cir. 1988) (en banc), *overruled on unrelated*

or *Coal for Parity* to support an injunction based on a sliding scale of the four factors, rather than a showing that each factor is independently satisfied.[6]

Aside from this sliding scale question, it is settled law that preliminary injunctive relief "is an extraordinary remedy never awarded as of right," but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 24. As an extraordinary remedy, courts should grant such relief sparingly. *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997). The Supreme Court has observed "that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Id.* Therefore, it is Plaintiff's burden to demonstrate with clear and compelling evidence that *each* of the four factors supports its request for preliminary injunctive relief. As explained below, Plaintiff has failed to carry that burden with respect to any of the four factors, let alone all of them.

## II. PLAINTIFF FAILS TO MEET ITS BURDEN TO JUSTIFY PRELIMINARY INJUNCTIVE RELIEF

### A. <u>Plaintiff Is Unlikely To Succeed on The Merits</u>

As the Supreme Court held in *Winter*, "[a] plaintiff seeking a preliminary injunction *must* establish that he is likely to succeed on the merits . . . ." 555 U.S. at 20 (emphases added). NWF

---

grounds by *Evans v. United States*, 504 U.S. 255 (1992) (stating that the Supreme Court is "the final arbiter of federal law" and "[w]hen the Supreme Court has spoken, its pronouncements become the law of the land").

[6] Other federal appellate courts have concluded that *Winter* compels the rejection of balancing tests and similar flexible standards. *See, e.g.*, *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009) ("balance-of-hardship test may no longer be applied [because] . . . the standard articulated in *Winter* governs the issuance of preliminary injunctions not only in the Fourth Circuit but in all federal courts") (judgment vacated, 130 S. Ct. 2371 (2010), legal standard reinstated, 607 F.3d 355 (4th Cir. 2010)); *see also Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009) ("Supreme Court's current statement of the test [in *Winter*] is the definitive one").

challenges the regulation at issue here pursuant to the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 701-706, alleging that the 40 C.F.R. § 124.55(b) violates Section 401 of the CWA, 33

U.S.C. § 1341.  Plaintiff's claim here must fail because it is time barred and not ripe for

consideration by this Court.  NWF has also failed to state a claim on which relief can be granted

because there has been no final agency action capable of violating the APA.  These objections are

set forth in Intervenor-Defendants' and EPA's Motions to Dismiss, filed contemporaneously with

this Statement of Points and Authorities. [7]  Finally, even if Plaintiff had a viable claim, the

regulation was a reasonable and appropriate exercise of EPA's statutory authority, to which a

court must defer.

   1. <u>Plaintiff's Claim Is Not Ripe</u>

  Plaintiff explains its claim and the relief it seeks by stating that "[t]he Court should

immediately stop EPA from applying the regulation."  Pl. Br. at 2.  NWF's claim against EPA is

not ripe and will not become justiciable because EPA is highly unlikely to ever "apply" the

regulation in this case.  NWF is effectively trying to salvage its claims in New York state court,

by precluding the state court from dismissing its claims as moot.  EPA has no role to play in

these circumstances, and will never apply the regulation if the New York court dismisses NWF's

complaint in that case.  The New York court will dismiss NWF's claim as moot by recognizing

the existence and continued validity of the regulation.  EPA will not be involved.

  That is not to say a claim against the regulation will never be ripe.  If a state were to seek

to add conditions to a federal permit after it was issued, EPA would have to apply the regulation,

and the state's claim against EPA would at that point be ripe.  But that is not the case here,

---

   [7] LCA and CSA also reserve the right to bring an additional motion to dismiss for lack of
subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

especially where New York has already issued its 401 Certification, and is currently defending its

Certification against NWF.  Pl. Br. Ex. 7 (Doc. 7-7).

Moreover, the New York court has not yet acted to dismiss NWF's claims in *National Wildlife Federation v. Marten* as moot.  Nor has the New York court indicated that it intends to take such action.  Unless and until the New York court takes such action, NWF's claim regarding the regulation cannot possibly be ripe.  *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (internal quotation marks omitted).

NWF has actually taken action to ensure that the New York court does not dismiss NWF's complaint as moot.  First, in a letter to the New York court dated April 30, 2013, NWF told the court that "NWF does not consider that this case will be moot as a result of the Regulation [40 C.F.R. § 124.55(b)]."  Ltr. from Neil Kagan to Judge McNamara at 1 (April 30, 2013), Ex. 1.  NWF told the New York court that it did not believe the regulation rendered its claim moot, despite bringing the instant claim in this Court the following day, asserting that the regulation would, in fact, render the New York case moot.  *See, e.g.*, Pl. Br. at 17 ("the New York court is substantially likely to conclude that it is compelled to acknowledge a federally-promulgated regulation and dismiss the case."); at 23 ("Delaying review is substantially likely to lead to the imminent dismissal of NWF's state lawsuit . . . ").  NWF thereafter sought to compel motion practice in the New York case on the issue of mootness.  Ltr. from Neil Kagan to Judge McNamara at 1 (May 1, 2013).[8]

Second, NWF has now – *ex parte* – sought a continuance of the New York action "until such time as this Court issues a final ruling in this action."  Notice at 1-2 (Doc. 14).  The New

York court has now directed the defendants in that case, New York, LCA and CSA, to show cause why the case should not be stayed. (Doc. 18).

In short, NWF's efforts to pursue relief in New York demonstrate that the dispute presently remains before the New York court, and EPA is not now, and may never be, involved in any proceeding in New York regarding the addition of new conditions to the VGP. Accordingly, NWF's challenge in this Court to the regulation, on the basis that it may be relied upon by the New York court in the future, is not ripe.

2.      Even If Plaintiff's Claim Was Ripe, It Is Time-Barred

Plaintiff is also unlikely to succeed on the merits because its claims are time-barred, and therefore this Court lacks subject matter jurisdiction to hear them.

a)      *Plaintiff's Claim Is A Facial Challenge To The Regulation*

In an attempt to avoid ripeness and other justiciability concerns, Plaintiff attempts to characterize its challenge to the regulation as an "as-applied" challenge. *See, e.g.*, Pl. Br. at 24 ("NWF is bringing the case to prevent EPA from applying the Regulation to New York."). NWF's claim is not, however, an as-applied challenge.

An as-applied challenge may be mounted only after an agency "enforces the regulation against [the plaintiff]." *Cellular Telecomm. & Internet Ass'n v. F.C.C.*, 330 F.3d 502, 509 (D.C. Cir. 2003); *see Flynt v. Rumsfeld*, 355 F.3d 697, 705 (D.C. Cir. 2004). Put another way, a plaintiff may only bring an as-applied challenge if he has been "personally injured by agency action." *P & V Enterprises v. U.S. Army Corps of Engr's*, 466 F. Supp. 2d 134, 143 (D.D.C. 2006) *aff'd*, 516 F.3d 1021 (D.C. Cir. 2008) (quotation omitted) (emphasis added). An as-applied challenge is to be distinguished from a facial challenge, which alleges that a regulation is

---

[8] This letter is attached hereto as Exhibit 3.

"invalid because it is without statutory authority." *I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 188 (1991).

Here, EPA has not applied the regulation, is not about to apply the regulation, and, in fact, has not taken any action on the regulation since it was promulgated in 1980. The only relevant EPA action on the regulation was taken 33 years ago, when EPA took final agency action to issue the regulation. *See* 45 Fed. Reg. 33,290 (May 19, 1980). EPA amended other sections of 40 C.F.R. § 124.55 in 1983 and 2000, but subsection (b) has never changed. *See* Fed. Reg. 14,146, 14,264, 14,274-75 (April 1, 1983); 65 Fed. Reg. 30,886, 30,912 (May 15, 2000). Thus, notwithstanding NWF's characterization to the contrary, NWF's claim must be a facial challenge to the validity of the regulation.

The lack of final agency action in this case also bars any claim brought under the APA, because final agency action is a pre-requisite to any claim brought under the APA. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990); *Bannum, Inc. v. Sawyer*, 251 F. Supp. 2d 7, 11 (D.D.C. 2003); *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1288 (5th Cir. 1997). Thus, regardless whether the claim is an as-applied challenge or a facial challenge, in the absence of final agency action NWF has failed to state a claim on which relief can be granted.

> b)    *Both the Clean Water Act and the Administrative Procedure Act Bar Plaintiff's Claim*

Plaintiff's claim, to the extent it has one, arises under either the Clean Water Act or the Administration Procedure Act. Complaint ¶ 2 (alleging violations of the APA and the CWA). Yet, under both avenues, Plaintiff's claim is barred by an applicable statute of limitations.

As noted above, NWF's claim cannot be an as-applied challenge under the APA because there has been no final agency action since EPA promulgated the regulation in 1980. NWF's

claim must therefore be a facial challenge to the regulation.  Such a challenge must fail, however, because the APA requires all claims challenging the validity of a regulation to be brought within six years after the regulation is promulgated.  *See* 28 U.S.C. § 2401(a) (stating that, with one exception not relevant here, "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues").  Because NWF's claim is being brought 33 years after the regulation was promulgated, NWF's claim is time-barred under the APA.

NWF's claim also appears to arise under the Clean Water Act itself.  Section 509(b)(1) of the CWA provides that "[r]eview of the Administrator's action … (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, … may be had by any interested person in the Circuit Court of Appeals of the United States ... upon application by such person."  33 U.S.C. § 1369(b)(1).  The question of whether this CWA provision applies to the regulation challenged here has already been decided by the D.C. Circuit.  *See NRDC v. EPA*, 673 F.2d 400 (D.C. Cir. 1982).  Section 509(b)(1) applies to NWF's claim.

Because a challenge to this regulation is reviewable under Section 509(b)(1)(E), jurisdiction to review EPA's promulgation of 40 C.F.R. § 124.55(b) lies exclusively in the United States Court of Appeals.  *Id.* at 402-03; *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 985-86 (D.C. Cir. 1997) (courts of appeals have exclusive jurisdiction over EPA actions listed in Section 509(b)(1)).  This Court therefore lacks jurisdiction over NWF's claim.

NWF was also required to bring its claim within 120 days of the promulgation of 40 C.F.R. § 124.55(b).  33 U.S.C. § 1369(b)(1) (claims under Section 509(b)(1) "shall be made within 120 days from the date of such determination, approval, promulgation, issuance or denial,

or after such date only if such application is based solely on grounds which arose after such 120th

day."). Because NWF's claim is being brought 33 years after the regulation was promulgated,

NWF's claim is time-barred under the CWA. *Nat'l Pork Producers Council v. EPA*, 635 F.3d

738, 754 (5th Cir. 2011) ("The 120-day time limit is well established, and this court has

explained that the limitation is strictly enforced.").

3.      The Regulation Is a Reasonable Application of the Clean Water Act

Even if NWF had a viable claim, it would be unlikely to succeed on the merits. EPA's

promulgation of the regulation was made pursuant to delegated authority and EPA's

interpretation is therefore entitled to deference under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837

(1984). *Chevron* requires courts to defer to agency discretion, unless the intent of Congress is

clear. *Id.* at 843-44. This deference applies regardless whether Congress has issued a broad grant

of authority, as it did in Section 401(d) of the Clean Water Act. "If Congress has explicitly left a

gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a

specific provision of the statute by regulation. Such regulations are given controlling weight

unless they are . . . manifestly contrary to the statute." *Id.* at 843-44.

Section 401(d) delegates to the EPA the broad authority to implement procedures for

CWA certification. *See* 33 U.S.C. § 1341(d). Pursuant to this broad delegation, EPA

promulgated regulations establishing such a procedure for certification, including 40 C.F.R. §

124.55(b), which sets forth an end date for states to add a condition. The D.C. Circuit made clear

in *American Paper Institute, Inc. v. EPA* that federal agencies have the authority to fill holes in

statutory schemes. 996 F.2d 346, 348 (D.C. Cir. 1993). There, the petitioner challenged CWA

Section 301, which requires permits to incorporate limitations needed to meet narrative water

quality standards. *Id.* at 350. To address the difficulty of permit writers to determine what

effluent limitations were necessary to meet narrative standards, EPA promulgated 40 C.F.R. §

122.44(d)(1)(vi), requiring permit writers to use one of three methods to translate narrative

criteria into chemical-specific effluent limitations.  *Id.*  The D.C. Circuit rejected petitioner's

argument that the regulation exceeded EPA's authority under the CWA, holding that such

regulations are "reasonable, authorized attempts at necessary gap-filling in the CWA statutory

scheme."  *Am. Paper*, 996 F.2d at 349.  The D.C. Circuit consistently defers to federal agencies'

reasonable interpretations of gaps, ambiguities, and silence in federal statutes.  *See, e.g.,*

*Anacosta Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 245, 247, 252-53 (D.C. Cir. 2011);

*Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1230 (D.C. Cir. 2007); *Am. Iron &*

*Steel Inst.*, 115 F.3d at 989, 995.

      The regulation at issue here, which effectively establishes a deadline of EPA's permit

issuance for states to add new conditions to the VGP, is also consistent with the remainder of the

CWA.  For example, Section 402(k) states that "[c]ompliance with a permit *issued* pursuant to

this section [NPDES permits] shall be deemed compliance" with the CWA.  33 U.S.C. 1342(k)

(emphasis added); *NRDC  v. EPA*, 822 F.2d at 111; *see also* 33 U.S.C.§ 1344(p) (providing the

same for Section 404 permits).  The Vessel General Permit has been issued.  78 Fed. Reg.

21,938.  Thus, pursuant to CWA Section 402(k), LCA and CSA can comply with the VGP as

"*issued* pursuant to this section" and remain in compliance with the CWA.  33 U.S.C. 1342(k)

(emphasis added).

      If NWF were correct that EPA is compelled by CWA Section 401 to add new conditions

to the VGP *at any time*, before or after issuance, Section 402(k) would be meaningless.  LCA and

CSA would have to comply with the permit as issued, *and* as unilaterally modified at any time by

any state from a which a 401 certification was required.  Such an eventuality undermines the certainty Section 402(k) was intended to bring to the NPDES permitting program.

For the foregoing reasons, Plaintiff NWF is unlikely to succeed on the merits, and indeed NWF's complaint should be dismissed.  The motions for a TRO and PI may be denied on this basis alone.

### B.   Plaintiff Will Not Suffer Irreparable Harm in the Absence of Preliminary Relief

A plaintiff seeking preliminary injunctive relief must demonstrate that it is likely to suffer immediate, irreparable harm in the absence of an injunction.  *Winter*, 555 U.S. at 22.  To meet this burden, the plaintiff must demonstrate an actual rather than a theoretical harm that is not merely *possible*, but rather is *likely*.  *Id.* at 8; *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006) ("[T]he injury must be both certain and great; it must be actual and not theoretical.") (quotation omitted).  Additionally, the injury must be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (quotation omitted).  Failure to show irreparable harm is sufficient grounds by itself to deny a preliminary injunction. *Winter*, 555 U.S. at 22; *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Plaintiff has failed to make any showing that it is likely to suffer irreparable harm in the absence of a preliminary injunction pending a decision on the merits of this case.  NWF alleges two harms that could result from the denial of its motion: (1) dismissal of its appeal in *National Wildlife Federation v. Martens*, and (2) the hypothetical introduction of aquatic invasive species into New York waters.  Pl. Br. at 37-43 (Doc. 7).  The first harm is not irreparable, and the second is not imminent or actual, but speculative.  Plaintiff's motion should therefore be denied.

23

1.      Dismissal of *National Wildlife Federation v. Martens* Does Not Constitute Irreparable Harm

Plaintiff correctly points out that the denial of its motions for preliminary injunctive relief may result in the New York Supreme Court's dismissal of *National Wildlife Federation v. Martens.* Pl. Br. at 37; *see* 40 C.F.R. § 124.55(b). But such a harm is not irreparable. If Plaintiff is successful on the merits in this case, it can always refile its claims in *National Wildlife Federation v. Martens*.

In New York, dismissal based upon a determination not involving the merits does not bar a later action. *Maitland v. Trojan Elec. & Mach. Co.*, 480 N.E.2d 736, 737 (N.Y. 1985). New York courts have repeatedly held that dismissal based on a law that is later revised is not a final determination on the merits, and thus should not be given *res judicata* effect. *E.g.*, *Matter of Meegan S. v. Donald T.*, 475 N.E. 449, 450 (N.Y. 1984) (explaining that an earlier decision "cannot be an adjudication of rights thereafter conferred by law, or bar a new proceeding to vindicate new rights") (quotation omitted); *Farkas v. N.Y. State Dep't of Civil Serv.*, 494 N.Y.S.2d 178, 179-80 (N.Y. App. Div. 1985). Consequently, the dismissal of *Nat'l Wildlife Fed'n v. Martens* fits the very definition of a *reparable* harm.

2.      Speculation Regarding Aquatic Invasive Species Does Not Constitute an Imminent or Actual Harm

Alternatively, Plaintiff argues that, if its motion is denied and *National Wildlife Federation v. Martens* is dismissed, "new aquatic invasive species . . . are likely to be introduced to New York waters and cause further environmental harm." Pl. Br. at 38. Plaintiff does not provide any evidence sufficient to meet its burden to establish imminent and actual irreparable harm. In fact, the available evidence suggests that there will not be any harm.

The 2013 VGP was issued by EPA only after EPA determined that the discharges authorized thereunder would comply with New York's water quality standards and the water quality standards of every other Great Lakes state. *See* 40 C.F.R. §§ 122.4, 123.25, 122.44(d). EPA also issued the 2013 VGP pursuant to a settlement agreement that strictly dictated EPA's compliance with the CWA. *See* Ex. 1. As NWF admits, EPA issued the VGP "[t]o address new invasive species and the significant harm they will cause." Pl. Br. at 1.

Thereafter, New York and every other Great Lakes state certified that the 2013 VGP would comply with each state's respective water quality standards. *E.g.*, Pl. Br. Ex. 7 at 3-6 (Doc. 7-7). Furthermore, all of the effluent limitations imposed by EPA and the states are consistent with the IMO and the Coast Guard and followed the analysis and advice of the SAB and NAS. *See* Pl. Br. at 40, Ex. 8 at 9 (Doc. 7-8), Ex. 13 at 2, 7 (Doc. 7-13). NWF has no basis to assert, as it does, that preliminary injunctive relief is needed to avert harm from invasive species in violation of New York's water quality standards.

Moreover, NWF does not present any evidence of actual harm  Instead, NWF simply asserts that invasive species will "likely be introduced to New York waters." Pl. Br. at 38. This is merely speculative, theoretical harm, and does not rise to the level of concrete, imminent  and actual irreparable harm required by the Supreme Court and the D.C. Circuit. The only support Plaintiff provides for this alleged harm is an unpersuasive attempt to re-litigate the merits of the New York case, in which NWF seeks to add numeric WQBELS to New York's 401 Certification. Pl. Br. at 38-43.[9] All that these arguments demonstrate is that NWF and New

---

[9] NWF actually admits that the numeric limits it seeks in the New York case are not feasible, stating that "[t]here is no known concentration of non-indigenous organisms greater than zero that will pose no threat to water quality standards." Pl. Br. at 40 (quoting NAS report). If that is true, no effluent limit sought by NWF could ensure compliance with the state's water

York disagree about what conditions are required for the discharges authorized by the VGP to meet New York's water quality standards. In the absence of any evidence that imminent harm is likely, this Court should deny its motion for a preliminary injunction. *See Winter*, 555 U.S. at 22.

In any event, the speculative introduction of aquatic invasive species cannot possibly present  imminent harm because the 2013 VGP does not go into effect until December 19, 2013. 76 Fed. Reg. at 76, 716.  For harm to be "imminent," it must be likely to occur prior to a decision on the merits.  *See N. Slope Borough v. Andrus*, 486 F. Supp. 326, 330 (D.D.C. 1979) (holding that plaintiff had not demonstrated irreparable harm because plaintiff would not "face serious irreparable harm prior to the final determination on the merits").  Because the 2013 VGP does not go into effect until December 19, 2013, all discharges of ballast water are currently, and will continue to be, governed by the 2008 VGP for the next seven months.  76 Fed. Reg. at 76, 716. Thus, neither New York's 401 Certification, nor the New York Court action, nor any action by this Court could have any effect on discharges of ballast water into New York state waters until December 19, 2013.  Pl. Br. Ex. 10 at 1 (Doc. 7-10).  Plaintiff can receive a hearing and adjudication on the merits of this case before December of 2013, and thus the environmental harm claimed by NWF is not imminent in any sense of the word.

Finally, Plaintiff has not shown that the possible introduction of aquatic invasive species would cause harm to Plaintiff's members as opposed to the environmental generally.  To prevail on a motion for a preliminary injunction, the plaintiff must show that *the plaintiff itself* is likely

---

quality standards – the relief NWF ostensibly seeks.  These numeric limits are also not currently technologically possible.  At the federal level, both agencies with jurisdiction over ballast water discharges – the EPA and the Coast Guard – have determined that there are no ballast water management systems that can be installed and operate satisfactorily on Lakers.  The states of New York, Wisconsin, Ohio, Indiana, Pennsylvania and Michigan have all reached the same conclusion.  Weakley Aff. ¶ 13-18.

to suffer an irreparable harm. *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 167 (D.C. Cir. 1969). It is not enough for the plaintiff to show some irreparable harm to the environment generally. *Winter*, 555 U.S. at 14-15, 26; *see also Village of Gambell*, 480 U.S. at 541-42. Even assuming that the denial of Plaintiff's motion for preliminary injunctive relief would cause harm to the environment, NWF has not demonstrated that such a harm would have more than a marginal impact on its members' enjoyment of the environment. Consequently, Plaintiff's motion should be denied. *See Winter*, 129 S. Ct. at 377-78 (denying plaintiffs' motion for a preliminary injunction where the plaintiffs' ability to study and observe animals would be only marginally effected by the denial of a preliminary injunction).

In sum, Plaintiff has not shown—and cannot show—that the dismissal of *National Wildlife Federation v. Martens* constitutes an irreparable harm. Nor has it shown that the possible introduction of aquatic invasive species is an imminent or actual, rather than speculative harm, or that these theoretical impacts will result in harm to Plaintiff or its members, rather than general "environmental harm." Therefore, this Court should deny Plaintiff's motion for preliminary relief.

### C.     The Balance of Equities Does Not Favor Plaintiff

Under the third requirement for a preliminary injunction, NWF must demonstrate that the balance of equities tips in its favor. *Winter*, 555 U.S. at 20. Plaintiff asks this Court to declare that 40 C.F.R. § 124.55(b) will not render the New York case moot and enjoin EPA from enforcing the regulation. In this case, the balance of the equities weighs heavily against such an injunction. As explained above, Plaintiff has failed to show that it will suffer any irreparable harm to a concrete, substantive interest in the absence of an injunction. On the other side of the balance, an injunction will force LCA and CSA to continue an expensive and time-consuming

litigation, and potentially expose LCA and CSA to permit conditions that are either economically devastating, constantly changing, or both.

        1.      <u>The State of New York Has Issued Its 401 Certification and Conditions</u>

Throughout its pleading, Plaintiff asserts that the regulation will "negate state authority," and "strip[] the State of New York of its Congressionally-recognized authority to . . . assure that discharges . . . comply with state water quality standards." Pl. Br. at 2; Complaint ¶ 1.  To put it mildly, the state of New York does not share this perspective on its own authority pursuant to CWA Section 401.  That is because New York has already issued its 401 Certification, after concluding that the conditions in that Certification would assure that the discharges authorized by the VGP would comply with the state's water quality standards.  New York is also now defending that 401 Certification in state court against NWF.  *See Nat'l Wildlife Fed'n v. Martens*, Index No. 6181-12 (N.Y. Sup. Ct.).

Thus, while NWF is attempting to force the state of New York to take action it does not want to take, NWF is also claiming here that preliminary injunctive relief is needed in this case to honor the state's right to act.  Clearly, the state has acted, and the only entity that NWF is seeking to benefit is itself.  As NWF admits elsewhere in its pleading, NWF wants this Court to act because "[d]ismissal [of the New York action] will deny NWF its day in Court." Pl. Br. at 2.  NWF has brought this suit, and seeks preliminary injunctive relief, for the sole purpose of enabling NWF to continue to sue New York (or any other state) whenever it pleases.

        2.      <u>An Injunction May Cause Significant Economic Harm</u>

LCA represents seventeen American companies that operate fifty-seven U.S.-flag vessels on the Great Lakes.  Weakley Aff. ¶ 2.  CSA represents Canadian companies that operate eighty vessels on the Great Lakes – St. Lawrence Seaway, as well as along the East Coast of North

America and in the Canadian Arctic.  Lewis-Manning Aff. ¶ 2.  LCA's and CSA's members play a significant role in the economies of the United States and Canada.  LCA's members' vessels carry the raw materials that help drive the American economy, including iron ore, coal, limestone, cement, salt, sand and grain.  Weakley Aff. ¶ 3-6.  CSA's members provide economical and sustainable transportation services to the steel, agricultural, mining, power generation, petroleum, and construction industries.  Lewis-Manning Aff. ¶ 3-5.  As a whole, marine transportation activities on the Great Lakes – St. Lawrence Seaway system create more than 227,000 jobs and generate more than $14.5 billion in salaries and wages in Canada and the United States.  Lewis-Manning Aff. ¶ 4.

Preliminary injunctive relief would require LCA and CSA to continue an expensive and burdensome litigation, but more importantly, would make it possible for NWF to force New York to add highly restrictive conditions to its 401 Certification.  These conditions would at the very least dramatically increase the cost of shipping through New York waters, and in the case of the numeric WQBELS sought by NWF, halt all shipping in New York waters entirely.

Treatment of ballast water by Lakers requires ballast water management systems, utilizing filtration, in-line treatments, biocides, or other technologies. Due to their layout, however, most existing Lakers cannot accommodate the physical footprint required by existing treatment systems.  Moreover, there are currently no technologies in production or being designed that have the capability to treat the extremely high flow rates and other unique characteristics of existing Lakers.  Weakley Aff. ¶ 13-15.  It would be impossible for most of LCA's and CSA's members to comply with the effluent limits sought by NWF, and therefore the imposition of such limits would effectively prohibit the operation of Lakers on New York waters.  This would be economically devastating to LCA's members and their employees, and would

have significant negative impacts on the region's economy and environment. Weakley Aff. ¶ 18-19; Lewis-Manning Aff. ¶ 9-10.

Action by this Court to enjoin the regulation would also expose LCA and CSA to considerable litigation risk. Although the 2013 VGP has been issued, and every state has either issued a 401 Certification or waived its right to do so, if this Court enjoins the regulation individual states could add new conditions to the VGP at any time. More likely than the states unilaterally changing their 401 Certifications, however, is the potential for interested parties to bring suit against those states and seek to force them to add new conditions. Without the regulation, LCA and CSA could find themselves defending litigations across the Great Lakes for the foreseeable future. This is precisely the result that the CWA deadline for adding new conditions to a federal permit seeks to avoid.

### D.       The Public Interest Would Not Be Served By An Injunction

The fourth requirement for a preliminary injunction is a showing that the injunction would serve the public interest. As the Supreme Court has emphasized, this showing must be made in every case before a preliminary injunction may be granted. *Winter*, 555 U.S. at 24 (courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction"). In fact, in *Winter*, the Supreme Court's determination that the preliminary injunction at issue would not serve the public interest was the decisive factor in its decision to overturn that injunction. *Id.* at 23. In this case, the public interest clearly weighs against granting an injunction.

The central feature of the Clean Water Act are the permits that authorize discharges, subject to certain conditions and limitations. *See, e.g.,* 33 U.S.C. §§ 1311(a), 1342(a). Once issued, a permit establishes requirements applicable to the covered activity for the term of the

permit. By complying with its permit, the permit holder complies with the CWA.  33 U.S.C. §

1342(k); 33 U.S.C. § 1344(p); *NRDC  v. EPA*, 822 F.2d at 111.  CWA permits remain the law as

to the covered discharges even if regulatory standards later change.  NPDES Permit Regulations,

49 Fed. Reg. 37,998, 38,045 (Sept. 26, 1984).  EPA itself has cautioned that "any attempt to

apply limitations or standards which were not in effect at the time of permit issuance constitutes

unauthorized overreaching by the permit issuing authority." *Id.*

    If 40 C.F.R. § 124.55(b) were enjoined, New York will be able to add conditions to the

VGP after it has been issued.  This means that all entities subject to the VGP, including all of

LCA's and CSA's members, will have no set permit to comply with, and will instead be forced to

adapt to any changing conditions, whether prompted by regulatory, scientific, or even political

motivations.  This will create an untenable situation for those subject to the VGP, and is exactly

the sort of uncertainty sought to be avoided when Congress created the NPDES program.  A

constantly malleable permit is not only unfair to the permittee, but as a practical matter it

needlessly impairs the ability to make sound business planning and capital investment decisions.

    Worse yet, there is no reason why an injunction against 40 C.F.R. § 124.55(b) should

only impact New York, or only impact the VGP.  If 40 C.F.R. § 124.55(b) were enjoined, every

state would presumably be able to add conditions to *any* federal permit requiring a 401

certification at *any* time.  New York could add new conditions to the VGP, while Utah added

new conditions to a Bureau of Land Management mineral exploration permit, while Alaska

modified a U.S. Army Corps of Engineer's Section 404 permit, while West Virginia added new

conditions to a SMCRA permit issued by the Office of Surface Mining.  Such an ever-changing

patchwork of rules would be a nightmare for both the regulated parties and the state and federal

regulators themselves.  Weakley Aff. ¶ 20; Lewis-Manning Aff. ¶ 11.  Such an eventuality is clearly not in the public interest.

Plaintiff claims that an injunction is in the public interests because "[i]t will uphold New York State's authority under section 401."  Pl. Br. at 44.  As noted above, this is an extremely misleading way of saying that NWF will be able to continue its lawsuit against New York, which has already exercised its authority under CWA Section 401 and is now defending the exercise of that authority against NWF in state court.  The remainder of Plaintiff's claims to the public interest are vague statements about public participation and the integrity of waters, accompanied only by equally vague citations to the Clean Water Act itself.  Pl. Br. at 44.

The public interest weighs overwhelmingly against an injunction, and Plaintiff's motion should be denied on that basis alone.

## III.    IF THE COURT GRANTS PLAINTIFF'S REQUEST FOR AN INJUNCTION, PLAINTIFF MUST POST A SUBSTANTIAL BOND AS A CONDITION OF ANY INJUNCTION

Plaintiff has asked this Court to issue a temporary restraining order or preliminary injunction that could have very substantial adverse financial consequences for Intervenor-Defendants.  As explained above, Plaintiff has utterly failed to meet its burden to warrant preliminary injunctive relief.  In the event that this Court disagrees, however, Plaintiff must post a substantial bond pursuant to Federal Rule of Civil Procedure 65(c) as a condition of any injunction that this Court may order.

Rule 65(c) states that "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The bond requirement "assur[es] compensation of the

defendant for the resulting losses if the injunction proves to have been wrongfully granted."

*Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992).   Additionally, the

bond requirement "deter[s] . . . flimsy claims" by "mak[ing] plaintiffs consider the damage they

may inflict by pressing ahead with a possibly losing claim."  *Id.* at 1134, 1135.   The only

exceptions to the bond requirement recognized by the rule are for "[t]he United States, its

officers, and its agencies." Fed. R. Civ. P. 65(c). The bond requirement is otherwise generally

mandatory.  *Id.*; *Malcolm v. Reno*, 129 F. Supp. 2d 1, 11 (D.D.C. 2000).

The bond requirement applies no less strictly to a plaintiff seeking to vindicate an

environmental interest than a plaintiff seeking to protect a commercial interest.   *In Habitat Educ.*

*Ctr. v. U.S. Forest Serv.*, the U.S. Court of Appeals for the Seventh Circuit affirmed a district

court's refusal to rescind an order requiring a nonprofit entity to post a $10,000 injunction bond,

dismissing the appellant's argument that it should be relieved of the bond requirement because it

was a "nonprofit enterprise . . . devoted to so great and general a good as the protection of the

environment."  607 F.3d 453, 455 (7th Cir. 2010).   The court noted that the argument that public

interest groups should be exempted from the requirement of posting injunction bonds "flies in

the face of Rule 65(c)" and contradicts the plain meaning of that rule.  *Id.* at 457.   The Seventh

Circuit acknowledged that, in a number of cases, district courts have waived the bond

requirement but observed that these cases fall into two distinct categories: (1) cases in which

injunctive relief is critically important to the moving party, but that party does not have the

financial capacity to post a bond, and (2) those in which the court is satisfied that there is no

danger that the non-moving party would incur damages as a result of the injunction.  *Id.* at 456-

57.   The case before the Seventh Circuit did not fall into either category.   The same is true here.

The bond should be set at an amount sufficient to compensate the defendant for losses resulting from being wrongfully enjoined.  *See, e.g., Nat'l Kidney Patients Ass'n*, 958 F.2d at 1134.  In considering the amount of the bond, courts consider both the potential loss to the defendant and the financial resources of the plaintiff.  *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (requiring a minimal bond due to the defendant's modest potential loss and the plaintiff's limited financial resources); *Malcolm v*, 129 F. Supp. 2d at 11-12 (same).

In this case, a very substantial bond is warranted to compensate Intervenor-Defendants from a wrongful injunction, and Plaintiff has the financial wherewithal to fund a very substantial bond.  Plaintiff NWF is a large, national organization with significant financial resources.  According to NWF's 2011 annual report, which is the most recent publicly available annual report and may reasonably be presumed to be representative of its current financial condition, the organization had an annual revenue of more than $107 million, with net assets in excess of $48 million.  National Wildlife Federation, 2011 Annual Report at 37 (excerpt attached hereto as Exhibit 4).[10]  National Wildlife Federation is therefore able to post a substantial bond to compensate Intervenor-Defendants for the significant losses they may incur as a result of the regulation being wrongfully enjoined.

---

[10] *See Selkirk Conservation Alliance v. Forsgren*, No. CV 01-1511-PA (D. Or. Sept. 17, 2002) (requiring Sierra Club and other plaintiffs to post bond in the amount of $100,000) (citing information from Sierra Club's tax return and concluding that "while Sierra Club may be a 'non-profit' organization, it is hardly destitute . . . . The prospect of having to post a large bond, and potentially forfeit that sum, may cause the Sierra Club to think twice before seeking an injunction . . . . If Sierra Club can afford to file and litigate over one hundred lawsuits a year, it can afford to answer for any damage that it causes").  The bond requirement was later vacated by Ninth Circuit Court as moot when it affirmed the district court's decision on the merits and dissolved the injunction. *See also Utahns for Better Transp. v. U.S. Dep't of Transp.*, Nos. 01-4216, 01-4217, 01-4220 (N.D. Utah Nov. 21, 2001) (requiring Sierra Club to post $50,000 injunction bond in suit challenging construction of a parkway based on loss of wetlands).

For the reasons stated above, Plaintiff is not entitled to an injunction and thus it should not be necessary for the Court to consider the amount of any bond.  If the Court issues an injunction, however, Intervenor-Defendants respectfully request a hearing to set the bond required under Rule 65(c) in an amount sufficient not only to compensate Intervenor-Defendants for any losses from being wrongfully enjoined, but also to ensure that Plaintiff, which otherwise has nothing at stake, does not cavalierly seek to impose the risk of enormous financial loss on Intervenor-Defendants.

## <u>CONCLUSION</u>

Plaintiff NWF is not entitled to preliminary injunctive relief.  Plaintiff is not likely to succeed on the merits, and in fact, its claim should be dismissed.  NWF has also failed to demonstrate any actual, imminent irreparable harm if no injunction is issued.  Finally, the balance of equities and the public interest cut against NWF because NWF is actually trying to undo state action, not affirm it, and NWF's proposed relief could severely disrupt federal permitting programs and lead to extraordinary expense for permittees like LCA and CSA.


Respectfully Submitted,

Dated:  __May 10, 2013_____                    _____/s/ David F. Rifkind_____
                                                                          David F. Rifkind (Bar No. 455585)
                                                                          LEONARD, STREET AND DEINARD, P.A.
                                                                          1350 I Street NW Suite 800
                                                                          Washington, DC 20005
                                                                          Telephone:  (202) 346-6900
                                                                          Facsimile:  (202) 346-6901
                                                                          david.rifkind@leonard.com

Matthew D. Melewski (*pro hac vice pending*)
Gregory A. Fontaine (*pro hac vice pending*)
LEONARD, STREET AND DEINARD, P.A.
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
Telephone:  (612) 335-1500
Facsimile:  (612) 335-1657
matthew.melewski@leonard.com
gregory.fontaine@leonard.com

*Counsel for Intervener-Defendants
Lake Carriers' Association and
Canadian Shipowners Association*

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2013, I mailed by United States Postal Service, certified mail, postage prepaid, the foregoing Statement of Points and Authorities in Opposition to Plaintiff's Motions for A Temporary Restraining Order and Preliminary Injunction, to the following at the addresses indicated:

Janice L. Goldman-Carter (Bar No. 415773)
NATIONAL WILDLIFE FEDERATION
901 E Street, N.W., Suite 400
Washington, DC 20004
Telephone:  (202) 797-6894
goldmancarterj@nwf.org

Neil S. Kagan (*pro hac vice*)
NATIONAL WILDLIFE FEDERATION
625 South State Street
745 Legal Research
Ann Arbor, MI 48109
Telephone: (734)-763-7087
Facsimile: (734) 764-8309
kagan@nwf.org

*Counsel for Plaintiff National Wildlife Federation*

Michele L. Walter (Bar No. 487329)
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Telephone: (202) 514-3376
Facsimile: (202) 353-7763
michele.walter@usdoj.gov

T. Monique Peoples (Bar No. 973762)
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Telephone: 202.514.9365
Facsimile: 202.514.8865
monique.peoples@usdoj.gov

*Counsel for Defendant U.S. Environmental Protection Agency*

Dated:  __May 10, 2013_____          _____/s/ David F. Rifkind_____
                                        David F. Rifkind (Bar No. 455585)
                                        LEONARD, STREET AND DEINARD, P.A.
                                        1350 I Street NW Suite 800
                                        Washington, DC 20005
                                        Telephone: (202) 346-6918
                                        David.Rifkind@leonard.com

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION, | |
| Plaintiff, | |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | Civil Action No. 1:13-cv-00617 (CKK) |
| Defendant, | |
| and | |
| LAKE CARRIERS' ASSOCIATION AND CANADIAN SHIPOWNERS ASSOCIATION, | |
| Intervenor-Defendants. | |

**INTERVENOR-DEFENDANTS LAKE CARRIERS' ASSOCIATION
AND CANADIAN SHIPOWNERS ASSOCIATION'S
STATEMENT OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR
A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# EXHIBIT 1

## SETTLEMENT AGREEMENT

WHEREAS the State of Michigan ("Michigan") filed a petition for review, pursuant to section 509(b)(1) of the Federal Water Pollution Control Act, 33 U.S.C. §1251 *et seq.*, ("CWA"), of the final general permit entitled "Final National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges Incidental to the Normal Operation of a Vessel," 73 Fed. Reg. 79,473 (Dec. 29, 2008) (the "Vessel General Permit" or "VGP") against Respondent the United States Environmental Protection Agency ("EPA"), which matter is pending in United States Court of Appeals for the District of Columbia Circuit ("the Court");

WHEREAS the Natural Resources Defense Council, Inc., National Wildlife Federation, Indiana Wildlife Federation, League of Ohio Sportsmen, Minnesota Conservation Federation, Prairie Rivers Network, Wisconsin Wildlife Federation, Alliance for the Great Lakes, Ohio Environmental Council, the Northwest Environmental Advocates, Center for Biological Diversity, and People for Puget Sound also filed a petition for review of the VGP;

WHEREAS all of the foregoing petitions for review were consolidated by the Court as Case No. 09-1089;

WHEREAS the VGP expires at midnight, December 19, 2013 and EPA intends to issue by November 30, 2012 a new Vessel General Permit ("Next VGP") to authorize the types of discharges currently subject to the VGP;

WHEREAS nothing in this Agreement is intended to affect the terms and conditions of the VGP, including its December 19, 2013 expiration date;

WHEREAS the Clean Water Act requires that all point source discharges, including ballast water discharges addressed by the VGP, must meet technology-based

1

effluent limitations representing the applicable levels of technology-based control, and more stringent water quality-based effluent limitations where such technology-based limitations are not sufficient to meet applicable water quality standards (*See P.U.D. No. 1 of Jefferson County et al. v Washington Dept. of Ecology*, 511 U.S. 700, 704 (1994)) ;

WHEREAS EPA has entered into arrangements with the National Academy of Sciences ("NAS") and EPA's Science Advisory Board ("SAB") to produce, respectively, (1) a report on approaches for deriving ecologically protective numeric concentrations of organisms in ballast water discharges, and (2) a report on the performance and availability of ballast water treatment technologies, both of which EPA intends to consider in developing the Next VGP;

WHEREAS EPA's primary purpose in arranging for the NAS and SAB reports is to put the Agency in the best position, when it is determining conditions for the next VGP, to: (1) derive numeric technology-based effluent limits for ballast water (SAB Report), (2) determine whether technology-based limits will cause, have reasonable potential to cause, or contribute to an excursion above any applicable state water quality standard, including narrative criteria (NAS Report), and (3) if water quality-based effluent limits are required, derive numeric water quality-based effluent limits for ballast water (NAS Report);

WHEREAS EPA intends to encourage the NAS and the SAB to complete their final reports by May 31, 2011;

WHEREAS EPA intends, when it processes the Next VGP, to improve upon the approach the Agency used to implement CWA §401's state certification provision for the VGP;

WHEREAS nothing in this Agreement is intended to affect any rights states may have under CWA §401, including paragraph (a)(2) of that section;

WHEREAS the Parties intend this Agreement to set forth terms for certain matters associated with EPA's issuance of the Next VGP.

NOW, THEREFORE, the Parties agree as follows:

### I. General Terms

1.      The Parties to this Agreement are Michigan and EPA.  The Parties understand that Lisa Jackson was sued in her official capacity as Administrator of the United States Environmental Protection Agency, and that all responsibilities arising under this Agreement are to be performed by EPA and not by Lisa Jackson in her individual capacity.

2.      This Agreement applies to, is binding upon, and inures to the benefit of the Parties (and their successors, assigns, and designees).

3.      For purposes of this Settlement Agreement, the following terms shall have the meanings provided below:

a.      "EPA" or "Agency" means Lisa Jackson, in her official capacity as the Administrator of EPA, or the Administrator's duly authorized representative, and the United States Environmental Protection Agency;

b.      The "United States" means the United States of America, including its officers, agencies, departments and instrumentalities;

c.      "The Litigation" means the petition for review filed by Michigan.

d.      "VGP" means the general permit entitled "Final National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges Incidental to the

3

Normal Operation of a Vessel" finalized on December 18, 2008 and announced at 73

Fed. Reg. 79,473 (Dec. 29, 2008);

     e.    "Next VGP" means the permit EPA intends to issue to authorize the types

of discharges incidental to the normal operation of a vessel currently authorized by the

VGP to become effective upon the VGP's expiration;

     f.    "Draft Next VGP" means the draft permit EPA intends to draft and

publish notice of in accordance with 40 CFR §124.6 and other applicable regulations

prior to issuing the Next VGP;

     g.    "NAS Report" means the report that EPA has entered into arrangements

with the NAS to produce on approaches for deriving ecologically protective numeric

concentrations of organisms in ballast water discharges;

     h.    "SAB Report" means the report that EPA has entered into arrangements

with the SAB to produce on the performance and availability of ballast water treatment

technologies.

## II. EPA Milestones

     4.    EPA will obtain final signature(s) of appropriate EPA officials on the

Draft Next VGP by November 30, 2011 and promptly submit notice of the Draft Next

VGP to the Federal Register for publication.

     5.    EPA will take final action on the Draft Next VGP by November 30, 2012.

If EPA does not issue (i.e., obtain final signatures of appropriate EPA officials on) a final

Next VGP by November 30, 2012, Michigan may invoke its rights under the dispute

resolution and remedy for non-compliance provisions in Paragraphs 29 and 30 of this

Agreement.

4

6.     EPA will commence consultation under the Endangered Species Act, 16 U.S.C. §1531 *et seq.*, for the Next VGP no later than 30 days after notification of the Draft Next VGP in the Federal Register.

## III. Clean Water Act Section 401 Certification

7.     EPA will provide states with at least 6 months after publication of the Draft Next VGP to grant, grant with condition, deny or waive certification under CWA §401.

8.     EPA will provide information to the states and facilitate communication among the states at a regional (*e.g.,* Great Lakes, Atlantic, Pacific, and Gulf) level regarding state certification of the Next VGP.  For purposes of this Paragraph, to "facilitate communication" means, at a minimum, to arrange for at least one conference call or meeting between the states at each regional level during the 6-month period referenced in Paragraph 7 to discuss appropriate interstate coordination on the states' CWA §401 certifications.  For purposes of this Paragraph, to "provide information" means, at a minimum, to explain to the states in a letter or other written format the states' obligations under 33 U.S.C. § 1341 and 40 C.F.R. §124.53(e) either prior to or upon commencement of the 6-month period referenced in Paragraph 7.

## IV. The Draft Next VGP

9.     EPA will include in the Draft Next VGP numeric concentration-based effluent limits for discharges of ballast water expressed as organisms per unit of ballast water volume.  Such limits will address at least the following three size groupings of organisms: (i) macrofauna/zooplankton, (ii) phytoplankton, and (iii) indicator microbes.  Such limits will be either technology-based or  water quality-based, or both.  The content

5

and applicability of such limits for discharges of ballast water included in the Draft Next VGP pursuant to this paragraph may vary depending upon vessel characteristics.

10.     EPA will make every effort to express *both* any technology and any necessary water quality-based effluent limits for ballast water included in the Draft Next VGP numerically.  EPA may express *either* any technology *or* any necessary water quality-based effluent limits for ballast water narratively (e.g., as BMPs) only if, in accordance with 40 C.F.R. §122.44(k)(3),  EPA concludes that numeric limits are infeasible to calculate.  Under no circumstances, however, will EPA decline to include in the Draft Next VGP the numeric limits to be developed under paragraph 9 for *both* technology- and water quality-based effluent limits for any given size grouping of organism on the basis that such limits are infeasible to calculate.

11.     If EPA concludes that either any technology-based effluent limits or any necessary water quality-based limits for ballast water discharges are infeasible to calculate numerically, EPA will include a detailed explanation for that conclusion in the administrative record for the Draft Next VGP and expressly request comment on it.

12.     Regardless of whether the numeric concentration-based effluent limits in the Next Draft VGP are water quality- or technology-based, or both, EPA will include in the administrative record for the Draft Next VGP an explanation of how the Agency complied with 40 C.F.R. §122.44(d)(1)'s requirements for (1) determining whether a discharge will cause, or have the reasonable potential to cause, or contribute to an excursion above any water quality standard, including EPA's explanation of how it evaluated applicable state water quality standards, including state narrative criteria, and (2) deriving appropriate water-quality based effluent limits (if required).

13.     Nothing in this Agreement shall be read to in any way affect EPA's obligations under the Clean Water Act and its implementing regulations, including the requirement that effluent limitations in permits for ballast water discharges must represent the applicable levels of technology-based control and permits must include more stringent water quality-based effluent limitations where such technology-based limitations are not sufficient to meet applicable water quality standards.

14.     EPA will include in the Draft Next VGP monitoring requirements for ballast water treatment systems onboard vessels specifying the parameter(s) to be monitored (*e.g.*, treatment unit flow, treatment unit pressure, active substance concentration, residual active substances, suspended solids, and/or indicator organisms) as EPA determines necessary to assess compliance with the ballast water effluent limits, consistent with 40 C.F.R. § 122.44(i)(1)(i)&(ii) and 122.45(e), with at least one of these parameters to be monitored on a monthly or more frequent basis.  EPA will include in the administrative record for the Next Draft VGP an explanation of how it determined the frequency of reporting of monitoring results by assessing the nature and effect of the discharges, as required by 40 CFR 122.44(i).  EPA will propose to make any ballast water monitoring information transmitted to the Agency in electronic form available to the public in electronic form.

15.     EPA will include in the Draft Next VGP an expiration date of 4 years from its effective date.

16.     EPA will include in the Draft Next VGP a reopener provision substantially the same as that in Attachment A to this Agreement.

17.     When EPA publishes notice of the Draft Next VGP for public comment,

the Agency will specifically request comment on whether the following numeric limits

for ballast water discharges (from *Performance Standards for the Discharge of Ballast

Water For Vessels Operating in California Waters, California Code of Regulations Title

2, Division 3, Chapter 1, Article 4.7, §§2293-2294* as codified as of the date of this

Agreement) should be included in the Next VGP:

   (a) No detectable living organisms that are greater than 50 micrometers in minimum
   dimension;

   (b) Less than 0.01 living organisms per milliliter that are less than 50 micrometers in
   minimum dimension and more than 10 micrometers in minimum dimension;

   (c) For living organisms that are less than 10 micrometers in minimum dimension:

   (1) less than 1,000 bacteria per 100 milliliter;

   (2) less than 10,000 viruses per 100 milliliter;

   (3) concentrations of microbes that are less than:
      (A) 126 colony forming units per 100 milliliters of *Escherichia coli*;
      (B) 33 colony forming units per 100 milliliters of Intestinal enterococci; and
      (C) 1 colony forming unit per 100 milliliters or 1 colony forming unit per gram
      of wet weight of zoological samples of Toxicogenic *Vibrio cholerae*
      (serotypes O1 and O139).

18.     When EPA publishes notice of the Draft Next VGP for public comment,

the Agency will specifically request comment on whether any ballast water management

plans that would be required under the Draft Next VGP should be made available to the

public.

## V. Other

19.     If either the NAS Report or the SAB Report (or both) have not been

completed by May 31, 2011, EPA will, no later than June 9, 2011, provide Michigan with

a summary of any information it has regarding the progress of the report(s) and a

8

summary of the Agency's plans for accomplishing its goal of deriving numeric

concentration-based effluent limits for ballast water for inclusion in the Draft Next VGP

in light of such delay.  After receiving such summaries, Michigan may invoke its rights

under the dispute resolution and remedy for non-compliance provisions of this

Agreement in Paragraphs 29 and 30 by providing written notice and a request for

negotiations indicating that it is Michigan's view that EPA's plan for how to proceed in

light of the delay is unsatisfactory.  Completion of the delayed report(s) which

precipitated invocation of the dispute resolution process in paragraphs 29 and 30 during

the pendency of that process shall constitute resolution of the dispute.  For purposes of

this Paragraph and Paragraph 20, the NAS Report will be considered "complete" when

the NAS informs EPA that a pre-publication version may be made available to the public,

and the SAB Report will be considered "complete" when the Science Advisory Board

either posts the final report on its official webpage or transmits the report to the

Administrator, whichever is earlier.

20.    EPA will make appropriate Agency staff (as determined by EPA)

available for at least two meetings with Michigan after the later of the NAS and SAB

reports is complete, with the first meeting to take place within 30 days of the receipt of

the later of the two reports and the second to take place within 30 days of the first

meeting.  The primary purpose of the first meeting will be for Michigan to present its

views to EPA staff regarding appropriate numeric concentration-based effluent limits for

ballast water and appropriate timeframes for regulated entities to come into compliance

with such limits for the Draft Next VGP.  The primary purpose of the second meeting

will be for EPA staff to explain to Michigan their expectations at that time regarding

appropriate numeric concentration-based effluent limits for ballast water and timeframes for regulated entities to come into compliance with such limits for the Draft Next VGP. For purposes of this Paragraph, EPA will be deemed to have made appropriate staff available if EPA has provided Michigan with its choice of three one-hour periods within the prescribed timeframes during which such staff are available to meet with Michigan either in person or by conference call.  EPA will schedule and hold the meetings during the time Michigan chooses.

21.     If within 21 days after the second meeting described in Paragraph 20, Michigan provides EPA with written notice that it believes EPA is unlikely to establish appropriate effluent limits and compliance timeframes for ballast water for the Draft Next VGP, EPA will provide Michigan with an opportunity for a meeting with appropriate Agency political management (as determined by EPA).   For the purposes of this Paragraph, EPA will be deemed to have provided Michigan with an "opportunity for a meeting" if EPA has provided Michigan with its choice of two one-hour periods during which Agency political management is available to meet with Michigan either in person or by conference call.  Barring unforeseen circumstances, EPA will schedule and hold the meeting during the time Michigan chooses.  In the event of unforeseen circumstances, EPA will promptly reschedule the meeting after conferring with Michigan.

22.     In the event Michigan chooses to attend any meeting scheduled by EPA under Paragraphs 20 or 21 in person rather than via conference call, Michigan will bear all of its costs associated with attendance.

23.     EPA will promptly provide Michigan with copies of the NAS and SAB reports when they are "complete" as defined in Paragraph 19.

## VI. Effective Date

24.     This Agreement shall become effective on the date (the "Effective Date")

that a fully executed copy of the Agreement is delivered by EPA to Michigan.  Such

delivery shall be accomplished by sending such executed copy to Michigan by electronic

transmission promptly upon final execution of the Agreement by the United States.

## VII. Release and Reservation of Rights

25.     This Agreement shall not constitute or be construed as an admission or

adjudication by the United States or EPA of any question of fact or law with respect to

any claim related to the VGP.  Nor is it an admission of violation of any law, rule,

regulation, or policy by the United States or EPA.

26.     This Agreement does not waive Michigan's right to challenge any final

agency action following compliance with the terms of this Agreement.  EPA does not

waive any defenses to such a challenge.

## VII. Termination of Settlement Agreement

27.     This Agreement shall terminate on the earlier of (a) the date that EPA

fulfills the last of its obligations under this Agreement, or (b) the date that Michigan

notifies EPA that it has elected to terminate this Agreement and reactivate the Litigation.

## VIII. Abeyance, Dispute Resolution and Remedy for Non-Compliance

28.     Promptly after the Effective Date, the Parties agree to file with the Court a

joint motion to hold the Litigation in abeyance.  Said joint motion will request that the

Court hold said litigation in abeyance until such time as this Agreement is terminated.  In

the event that this Agreement is terminated because Michigan has chosen to reactivate the

Litigation, the Parties will file motions to govern further proceedings.  In the event that

11

this Agreement is terminated because EPA has discharged its obligations hereunder, the Parties agree to join in a motion to dismiss the Litigation with prejudice.

29.     In the event of a disagreement concerning any aspect of this Agreement, including any asserted noncompliance with the Agreement, EPA or Michigan (whichever is dissatisfied) shall provide the other with written notice of the dispute and a request for negotiations.  EPA and Michigan shall meet and confer in order to attempt to resolve the dispute within 21 days of the written notice, or, for a dispute concerning the failure of the NAS or the SAB to complete its report by May 31, 2011, within 14 days of the written notice, or such time thereafter as is mutually agreed.  If EPA and Michigan are unable to resolve the dispute within 21 days of such meeting, or, for a dispute concerning the failure of the NAS or the SAB to complete its report by May 31, 2011, within 14 days of the meeting, then Michigan's sole remedy for asserted noncompliance is to reactivate the Litigation, and any such reactivation renders any remaining EPA obligations under this Agreement null and void.  EPA does not waive or limit any defense relating to such litigation.  The Parties agree that contempt of court is not an available remedy under this Agreement.

30.     In order to invoke the procedures and remedies in Paragraph 29, any written notice of a dispute and request for negotiations under that Paragraph provided by Petitioners must be signed by authorized representatives of Michigan.

### IX. Force Majeure

31.     The Parties recognize that performance of this Agreement is subject to fiscal and procurement laws and regulations of the United States which include, but are not limited to, the Anti-Deficiency Act, 31 U.S.C. § 1341, et seq.  The possibility exists

that circumstances outside the reasonable control of EPA could delay EPA's compliance

with the deadlines, responsibilities or other expectations specified or contained in this

Agreement.  Such situations include, but are not limited to, a government shutdown; or

an extreme weather event that prevents EPA staff (or, in the case of matters addressed in

Paragraph 19, the NAS or SAB)  from meeting the deadlines, fulfilling the

responsibilities, or meeting the expectations specified or contained in this Agreement; or

a catastrophic environmental event that diverts EPA's staff resources away from meeting

the deadlines, fulfilling the responsibilities, or meeting the expectations specified or

contained in this Agreement.  Should a delay occur due to such circumstances, any

resulting failure by EPA to meet the responsibilities set forth herein shall not constitute a

failure to comply with the terms of this Agreement, and any deadlines (including the May

31, 2011 date for completion of the NAS and SAB reports) so affected shall be extended

one day for each day of the delay.  EPA will provide Michigan with reasonable notice

and explanation for the delay (including an explanation of how EPA staff assigned to the

VGP were affected by the event causing the delay) in the event that EPA invokes this

provision.  Any dispute regarding invocation of this provision, or the length of the

claimed delay, shall be resolved in accordance with the dispute resolution provision of

Paragraphs 29 and 30 of this Agreement.

## X.  Modifications

32.     If a subsequent change in law relieves EPA of its responsibilities

concerning matters addressed in this Agreement, then the Parties shall amend the

Agreement to conform to such changes.  Any dispute regarding invocation of this

provision shall be resolved in accordance with the dispute resolution provision of

Paragraphs 29 and 30 of this Agreement.

33.    The Parties may modify any deadline or other term of this Agreement in writing. In the event litigation is reactivated in <u>Natural Resources Defense Council</u> v. <u>EPA,</u> No. 09-1089 (D.C. Cir.) by any party other than Michigan, either Michigan or EPA, by notification of the other, may unilaterally modify this Agreement to provide for its immediate termination.

### XI.  Agency Discretion

34.    Except as expressly provided herein, or in any subsequent amendment to this Settlement Agreement, nothing in this Settlement Agreement shall be construed to limit or modify the discretion accorded to EPA by the CWA, the Administrative Procedure Act, or by any other law, including general principles of administrative law.

### XII. Notice

35.    All notices required or made with respect to this Agreement shall be in writing and shall be effective, unless otherwise stated, on the date that notice is delivered by an overnight mail/delivery service.  For any matter relating to this Agreement, the contact persons for Michigan and EPA are:

<u>For Petitioner, Michigan</u>:

Division Chief
Environment, Natural Resources and Agriculture Division
Michigan Department of Attorney General
525 W. Ottawa Street
P.O. Box 30212 Lansing, MI 48909

Chief
Water Resources Division
Michigan Department of Natural Resources and Environment
525 W. Allegan Street
P.O. Box 30473
Lansing, Michigan 48909-7973

14

For EPA:

Associate General Counsel, Water Law Office
Office of General Counsel (2355)
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, DC  20460

Chief
Environmental Defense Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, D.C.  20026-3986

36.     Upon written notice to the other Party, any Party may designate a
successor contact person for any matter relating to this Agreement.

### XIII. Representative Authority

37.     Each undersigned representative of the Parties certifies that he or she is
fully authorized by the Party to enter into, execute, and bind such Party to this
Agreement.

### XIV. Mutual Drafting

38.     This Agreement was negotiated between EPA and Michigan and jointly
drafted by the Parties.  Accordingly, the Parties hereby agree that any and all rules of
construction to the effect that ambiguity is construed against the drafting Party shall be
inapplicable in any dispute concerning the terms, meaning, or interpretation of this
Agreement.

### XV. Counterparts

39.     This Agreement may be executed in any number of counterpart originals,
each of which shall be deemed to constitute an original Agreement, and all of which shall

constitute one Agreement.  The execution of one counterpart by any Party shall have the same force and effect as if that Party had signed all other counterparts.

### XVI. Use of Settlement Agreement

40.     This Agreement shall not constitute an admission or evidence of any fact, wrongdoing, misconduct, or liability on the part of any Party.

### XVII. Compliance with Other Laws

41.     No provision of this Agreement shall be interpreted as or constitute a commitment or requirement that EPA obligate or pay funds in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or take any action in contravention of the APA, the CWA, or any other law or regulation, either substantive or procedural.

### XVIII. Applicable Law

42.     This Agreement shall be governed by and construed under the laws of the United States.

### XIX. Third Party Beneficiaries

43.     Nothing in this Agreement shall be construed to make any other person or entity not executing this Agreement a third-party beneficiary to this Agreement.

44.     The Parties consent to the form and substance of the foregoing Agreement.

### XX.     Fees or Other Costs

45.     Michigan agrees that it will not seek reimbursement from EPA or the United States for any attorneys' fees or other costs that it has incurred or may hereafter incur in connection with this litigation or this Settlement Agreement.

DATE:  _March 3, 2011_     _[signature]_

MARTIN F. MCDERMOTT
United States Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, D.C.  20026-3986
(202)514-4122

*Counsel for EPA*


DATE:  _2/24/2011_     _[signature]_

ROBERT P. REICHEL
Assistant Attorney General
Environment, Natural Resources and Agriculture
    Division
Michigan Department of Attorney General
525 W. Ottawa Street
P.O. Box 30212
Lansing, Michigan  48909
(517)373-7540

*Counsel for State of Michigan*

17

ATTACHMENT A

*§ XXX – **Modification of the VGP:*** This permit is subject to
modification in accordance with 40 CFR 124.5 and 122.62.
Grounds for such modification include receipt of new
information that was not available at the time of permit
issuance (other than revised regulations, guidance, or test
methods) and would have justified the application of different
permit conditions at the time of permit issuance.  With respect
to ballast water discharges, new information that will be
considered in determining whether to modify this permit
includes, but is not limited to, data or information from
permittees, the general public, states, academia, scientific or
technical articles or studies, and results of monitoring
conducted under this permit indicating that:

- Treatment technology has improved such that these
  improved technologies would have justified the application
  of significantly more stringent effluent limitations or other
  permit conditions had they been known at the time of
  permit issuance;

- Treatment technologies known of at the time of permit
  issuance perform significantly better than understood at the
  time of permit issuance such that this improved
  performance would have justified the application of
  significantly more stringent effluent limitations or other
  permit conditions had this been understood at the time of
  permit issuance;

- Scientific understanding of pollutant effects or of invasion
  biology has evolved such that this new information would
  have justified the application of significantly more stringent
  effluent limitations or other permit conditions had this been
  understood of at the time of permit issuance; or

- The cumulative effects of any discharge authorized by the
  VGP on the environment are unacceptable.

18

## SETTLEMENT AGREEMENT

WHEREAS the Natural Resources Defense Council, Inc. ("NRDC") filed a

petition for review, pursuant to section 509(b)(1) of the Federal Water Pollution Control

Act, 33 U.S.C. §1251 *et seq.*, ("CWA"), of the final general permit entitled "Final

National Pollutant Discharge Elimination System (NPDES) General Permit for

Discharges Incidental to the Normal Operation of a Vessel," 73 Fed. Reg. 79,473 (Dec.

29, 2008) (the "Vessel General Permit" or "VGP") against Respondent the United States

Environmental Protection Agency ("EPA"), which matter is pending in United States

Court of Appeals for the District of Columbia Circuit ("the Court");

WHEREAS the National Wildlife Federation, Indiana Wildlife Federation,

League of Ohio Sportsmen, Minnesota Conservation Federation, Prairie Rivers Network,

Wisconsin Wildlife Federation, Alliance for the Great Lakes, and Ohio Environmental

Council (collectively "NWF") also filed a petition for review of the VGP;

WHEREAS the Northwest Environmental Advocates, Center for Biological

Diversity, and People for Puget Sound (collectively "NWEA") also filed petitions for

review of the VGP and VGP-related action;

WHEREAS NRDC on behalf of itself and NWF has also sent a notice of intent to

pursue legal action under the Endangered Species Act, 16 U.S.C.§1531 *et seq.*, with

respect to the VGP ("Notice of Intent");

WHEREAS all of the foregoing petitions for review were consolidated by the

Court as Case No. 09-1089;

WHEREAS the VGP expires at midnight, December 19, 2013 and EPA intends to

issue by November 30, 2012 a new Vessel General Permit ("Next VGP") to authorize the

types of discharges currently subject to the VGP;

1

WHEREAS nothing in this Agreement is intended to affect the terms and conditions of the VGP, including its December 19, 2013 expiration date;

WHEREAS the Clean Water Act requires that all point source discharges, including ballast water discharges addressed by the VGP, must meet technology-based effluent limitations representing the applicable levels of technology-based control, and more stringent water quality-based effluent limitations where such technology-based limitations are not sufficient to meet applicable water quality standards (*See P.U.D. No. 1 of Jefferson County et al. v Washington Dept. of Ecology*, 511 U.S. 700, 704 (1994)) ;

WHEREAS EPA has entered into arrangements with the National Academy of Sciences ("NAS") and EPA's Science Advisory Board ("SAB") to produce, respectively, (1) a report on approaches for deriving ecologically protective numeric concentrations of organisms in ballast water discharges, and (2) a report on the performance and availability of ballast water treatment technologies, both of which EPA intends to consider in developing the Next VGP;

WHEREAS EPA's primary purpose in arranging for the NAS and SAB reports is to put the Agency in the best position, when it is determining conditions for the next VGP, to: (1) derive numeric technology-based effluent limits for ballast water (SAB Report), (2) determine whether technology-based limits will cause, have reasonable potential to cause, or contribute to an excursion above any applicable state water quality standard, including narrative criteria (NAS Report), and (3) if water quality-based effluent limits are required, derive numeric water quality-based effluent limits for ballast water (NAS Report);

WHEREAS EPA intends to encourage the NAS and the SAB to complete their final reports by May 31, 2011;

WHEREAS EPA intends, when it processes the Next VGP, to improve upon the approach the Agency used to implement CWA §401's state certification provision for the VGP;

WHEREAS nothing in this Agreement is intended to affect any rights states may have under CWA §401, including paragraph (a)(2) of that section;

WHEREAS the Parties intend this Agreement to set forth terms for certain matters associated with EPA's issuance of the Next VGP.

NOW, THEREFORE, the Parties agree as follows:

## I. General Terms

1.      The Parties to this Agreement are NRDC, NWF, NWEA and EPA.  The Parties understand that Lisa Jackson was sued in her official capacity as Administrator of the United States Environmental Protection Agency, and that all responsibilities arising under this Agreement are to be performed by EPA and not by Lisa Jackson in her individual capacity.

2.      This Agreement applies to, is binding upon, and inures to the benefit of the Parties (and their successors, assigns, and designees).

3.      For purposes of this Settlement Agreement, the following terms shall have the meanings provided below:

a.      "EPA" or "Agency" means Lisa Jackson, in her official capacity as the Administrator of EPA, or the Administrator's duly authorized representative, and the United States Environmental Protection Agency;

3

     b.     "Petitioners," with an upper case "P," means the Natural Resources

Defense Council, Inc., National Wildlife Federation, Indiana Wildlife Federation, League

of Ohio Sportsmen, Minnesota Conservation Federation, Prairie Rivers Network,

Wisconsin Wildlife Federation, Alliance for the Great Lakes, Ohio Environmental

Council, Northwest Environmental Advocates, Center for Biological Diversity, and

People for Puget Sound, acting collectively, as a group;

     c.     "Petitioner" or "petitioners" with a lower case "p" means any one or more

of the parties listed in subparagraph 3.b., above ;

     d.     The "United States" means the United States of America, including its

officers, agencies, departments and instrumentalities;

     e.     "The Litigation" means the petitions for review filed by NRDC, NWF,

and NWEA.

     f.     "VGP" means the general permit entitled "Final National Pollutant

Discharge Elimination System (NPDES) General Permit for Discharges Incidental to the

Normal Operation of a Vessel" finalized on December 18, 2008 and announced at 73

Fed. Reg. 79,473 (Dec. 29, 2008);

     g.     "Next VGP" means the permit EPA intends to issue to authorize the types

of discharges incidental to the normal operation of a vessel currently authorized by the

VGP to become effective upon the VGP's expiration;

     h.     "Draft Next VGP" means the draft permit EPA intends to draft and

publish notice of in accordance with 40 CFR §124.6 and other applicable regulations

prior to issuing the Next VGP;

i.      "NAS Report" means the report that EPA has entered into arrangements with the NAS to produce on approaches for deriving ecologically protective numeric concentrations of organisms in ballast water discharges;

j.      "SAB Report" means the report that EPA has entered into arrangements with the SAB to produce on the performance and availability of ballast water treatment technologies.

## II. EPA Milestones

4.      EPA will obtain final signature(s) of appropriate EPA officials on the Draft Next VGP by November 30, 2011 and promptly submit notice of the Draft Next VGP to the Federal Register for publication.

5.      EPA will take final action on the Draft Next VGP by November 30, 2012. If EPA does not issue (i.e., obtain final signatures of appropriate EPA officials on) a final Next VGP by November 30, 2012, Petitioners may invoke their rights under the dispute resolution and remedy for non-compliance provisions in Paragraphs 29 and 30 of this Agreement.

6.      EPA will commence consultation under the Endangered Species Act, 16 U.S.C. §1531 *et seq.*, for the Next VGP no later than 30 days after notification of the Draft Next VGP in the Federal Register.

## III. Clean Water Act Section 401 Certification

7.      EPA will provide states with at least 6 months after publication of the Draft Next VGP to grant, grant with condition, deny or waive certification under CWA §401.

5

8.      EPA will provide information to the states and facilitate communication

among the states at a regional (*e.g.,* Great Lakes, Atlantic, Pacific, and Gulf) level

regarding state certification of the Next VGP.  For purposes of this Paragraph, to

"facilitate communication" means, at a minimum, to arrange for at least one conference

call or meeting between the states at each regional level during the 6-month period

referenced in Paragraph 7 to discuss appropriate interstate coordination on the states'

CWA §401 certifications.  For purposes of this Paragraph, to "provide information"

means, at a minimum, to explain to the states in a letter or other written format the states'

obligations under 33 U.S.C. § 1341 and 40 C.F.R. §124.53(e) either prior to or upon

commencement of the 6-month period referenced in Paragraph 7.

## IV. The Draft Next VGP

9.      EPA will include in the Draft Next VGP numeric concentration-based

effluent limits for discharges of ballast water expressed as organisms per unit of ballast

water volume.  Such limits will address at least the following three size groupings of

organisms: (i) macrofauna/zooplankton, (ii) phytoplankton, and (iii) indicator microbes.

Such limits will be either technology-based or  water quality-based, or both.  The content

and applicability of such limits for discharges of ballast water included in the Draft Next

VGP pursuant to this paragraph may vary depending upon vessel characteristics.

10.      EPA will make every effort to express *both* any technology and any

necessary water quality-based effluent limits for ballast water included in the Draft Next

VGP numerically.  EPA may express *either* any technology *or* any necessary water

quality-based effluent limits for ballast water narratively (e.g., as BMPs) only if, in

accordance with 40 C.F.R. §122.44(k)(3),  EPA concludes that numeric limits are

6

infeasible to calculate.  Under no circumstances, however, will EPA decline to include in

the Draft Next VGP the numeric limits to be developed under paragraph 9 for *both*

technology- and water quality-based effluent limits for any given size grouping of

organism on the basis that such limits are infeasible to calculate.

11.     If EPA concludes that either any technology-based effluent limits or any

necessary water quality-based limits for ballast water discharges are infeasible to

calculate numerically, EPA will include a detailed explanation for that conclusion in the

administrative record for the Draft Next VGP and expressly request comment on it.

12.     Regardless of whether the numeric concentration-based effluent limits in

the Next Draft VGP are water quality- or technology-based, or both, EPA will include in

the administrative record for the Draft Next VGP an explanation of how the Agency

complied with 40 C.F.R. §122.44(d)(1)'s requirements for (1) determining whether a

discharge will cause, or have the reasonable potential to cause, or contribute to an

excursion above any water quality standard, including EPA's explanation of how it

evaluated applicable state water quality standards, including state narrative criteria, and

(2) deriving appropriate water-quality based effluent limits (if required).

13.     Nothing in this Agreement shall be read to in any way affect EPA's

obligations under the Clean Water Act and its implementing regulations, including the

requirement that effluent limitations in permits for ballast water discharges must

represent the applicable levels of technology-based control and permits must include

more stringent water quality-based effluent limitations where such technology-based

limitations are not sufficient to meet applicable water quality standards.

7

14.     EPA will include in the Draft Next VGP monitoring requirements for

ballast water treatment systems onboard vessels specifying the parameter(s) to be

monitored (*e.g.*, treatment unit flow, treatment unit pressure, active substance

concentration, residual active substances, suspended solids, and/or indicator organisms)

as EPA determines necessary to assess compliance with the ballast water effluent limits,

consistent with 40 C.F.R. § 122.44(i)(1)(i)&(ii) and 122.45(e), with at least one of these

parameters to be monitored on a monthly or more frequent basis.  EPA will include in the

administrative record for the Next Draft VGP an explanation of how it determined the

frequency of reporting of monitoring results by assessing the nature and effect of the

discharges, as required by 40 CFR 122.44(i).  EPA will propose to make any ballast

water monitoring information transmitted to the Agency in electronic form available to

the public in electronic form.

15.     EPA will include in the Draft Next VGP an expiration date of 4 years from

its effective date.

16.     EPA will include in the Draft Next VGP a reopener provision substantially

the same as that in Attachment A to this Agreement.

17.     When EPA publishes notice of the Draft Next VGP for public comment,

the Agency will specifically request comment on whether the following numeric limits

for ballast water discharges (from *Performance Standards for the Discharge of Ballast

Water For Vessels Operating in California Waters, California Code of Regulations Title

2, Division 3, Chapter 1, Article 4.7, §§2293-2294* as codified as of the date of this

Agreement) should be included in the Next VGP:

(a) No detectable living organisms that are greater than 50 micrometers in minimum
dimension;

(b) Less than 0.01 living organisms per milliliter that are less than 50 micrometers in minimum dimension and more than 10 micrometers in minimum dimension;

(c) For living organisms that are less than 10 micrometers in minimum dimension:

   (1) less than 1,000 bacteria per 100 milliliter;

   (2) less than 10,000 viruses per 100 milliliter;

   (3) concentrations of microbes that are less than:
     (A) 126 colony forming units per 100 milliliters of *Escherichia coli*;
     (B) 33 colony forming units per 100 milliliters of Intestinal enterococci; and
     (C) 1 colony forming unit per 100 milliliters or 1 colony forming unit per gram of wet weight of zoological samples of Toxicogenic *Vibrio cholerae* (serotypes O1 and O139).

18.    When EPA publishes notice of the Draft Next VGP for public comment, the Agency will specifically request comment on whether any ballast water management plans that would be required under the Draft Next VGP should be made available to the public.

## V.  Other

19.    If either the NAS Report or the SAB Report (or both) have not been completed by May 31, 2011, EPA will, no later than June 9, 2011, provide Petitioners with a summary of any information it has regarding the progress of the report(s) and a summary of the Agency's plans for accomplishing its goal of deriving numeric concentration-based effluent limits for ballast water for inclusion in the Draft Next VGP in light of such delay.  After receiving such summaries, Petitioners may invoke their rights under the dispute resolution and remedy for non-compliance provisions of this Agreement in Paragraphs 29 and 30 by providing written notice and a request for negotiations indicating that it is Petitioners' view that EPA's plan for how to proceed in light of the delay is unsatisfactory.  Completion of the delayed report(s) which

precipitated invocation of the dispute resolution process in paragraphs 29 and 30 during

the pendency of that process shall constitute resolution of the dispute.  For purposes of

this Paragraph and Paragraph 20, the NAS Report will be considered "complete" when

the NAS informs EPA that a pre-publication version may be made available to the public,

and the SAB Report will be considered "complete" when the Science Advisory Board

either posts the final report on its official webpage or transmits the report to the

Administrator, whichever is earlier.

20.     EPA will make appropriate Agency staff (as determined by EPA)

available for at least two meetings with Petitioners after the later of the NAS and SAB

reports is complete, with the first meeting to take place within 30 days of the receipt of

the later of the two reports and the second to take place within 30 days of the first

meeting.  The primary purpose of the first meeting will be for Petitioners to present their

views to EPA staff regarding appropriate numeric concentration-based effluent limits for

ballast water and appropriate timeframes for regulated entities to come into compliance

with such limits for the Draft Next VGP.  The primary purpose of the second meeting

will be for EPA staff to explain to Petitioners their expectations at that time regarding

appropriate numeric concentration-based effluent limits for ballast water and timeframes

for regulated entities to come into compliance with such limits for the Draft Next VGP.

For purposes of this Paragraph, EPA will be deemed to have made appropriate staff

available if EPA has provided Petitioners with their choice of three two-hour periods

within the prescribed timeframes during which such staff are available to meet with

Petitioners either in person or by conference call.  EPA will schedule and hold the

meetings during the time Petitioners choose.

21.    If within 21 days after the second meeting described in Paragraph 20, any petitioner provides EPA with written notice that such petitioner believes EPA is unlikely to establish appropriate effluent limits and compliance timeframes for ballast water for the Draft Next VGP, EPA will provide Petitioners with an opportunity for a meeting with appropriate Agency political management (as determined by EPA). For the purposes of this Paragraph, EPA will be deemed to have provided Petitioners with an "opportunity for a meeting" if EPA has provided Petitioners with their choice of two one-hour periods during which Agency political management is available to meet with Petitioners either in person or by conference call. Barring unforeseen circumstances, EPA will schedule and hold the meeting during the time Petitioners choose. In the event of unforeseen circumstances, EPA will promptly reschedule the meeting after conferring with Petitioners.

22.    In the event any petitioner chooses to attend any meeting scheduled by EPA under Paragraphs 20 or 21 in person rather than via conference call, such petitioner will bear all of their costs associated with attendance.

23.    EPA will promptly provide Petitioners with copies of the NAS and SAB reports when they are "complete" as defined in Paragraph 19.

### VI. Effective Date

24.    This Agreement shall become effective on the date (the "Effective Date") that a fully executed copy of the Agreement is delivered by EPA to Petitioners. Such delivery shall be accomplished by sending such executed copy to Petitioners by electronic transmission promptly upon final execution of the Agreement by the United States.

### VII. Release and Reservation of Rights

25.     This Agreement shall not constitute or be construed as an admission or

adjudication by the United States or EPA of any question of fact or law with respect to

any claim related to the VGP.  Nor is it an admission of violation of any law, rule,

regulation, or policy by the United States or EPA.

26.     This Agreement does not waive any petitioner's right to challenge any

final agency action following compliance with the terms of this Agreement.  EPA does

not waive any defenses to such a challenge.

### VII. Termination of Settlement Agreement

27.     This Agreement shall terminate on the earlier of (a) the date that EPA

fulfills the last of its obligations under this Agreement, or (b) the date that Petitioners

notify EPA that Petitioners have elected to terminate this Agreement and reactivate the

Litigation.

### VIII. Abeyance, Dispute Resolution and Remedy for Non-Compliance

28.     Promptly after the Effective Date, the Parties agree to file with the Court a

joint motion to hold the Litigation in abeyance.  Said joint motion will request that the

Court hold said litigation in abeyance until such time as this Agreement is terminated.  In

the event that this Agreement is terminated because Petitioners have chosen to reactivate

the Litigation, the Parties will file motions to govern further proceedings.  In the event

that this Agreement is terminated because EPA has discharged its obligations hereunder,

the Parties agree to join in a motion to dismiss the Litigation with prejudice.  The Parties

understand and agree that EPA's discharge of its obligations hereunder will render moot

the Notice of Intent.

29.     In the event of a disagreement concerning any aspect of this Agreement, including any asserted noncompliance with the Agreement, EPA or Petitioners (whichever is dissatisfied) shall provide the other with written notice of the dispute and a request for negotiations. EPA and Petitioners shall meet and confer in order to attempt to resolve the dispute within 21 days of the written notice, or, for a dispute concerning the failure of the NAS or the SAB to complete its report by May 31, 2011, within 14 days of the written notice, or such time thereafter as is mutually agreed. If EPA and Petitioners are unable to resolve the dispute within 21 days of such meeting, or, for a dispute concerning the failure of the NAS or the SAB to complete its report by May 31, 2011, within 14 days of the meeting, then Petitioners' sole remedy for asserted noncompliance is to reactivate the Litigation, and any such reactivation renders any remaining EPA obligations under this Agreement null and void. EPA does not waive or limit any defense relating to such litigation. The Parties agree that contempt of court is not an available remedy under this Agreement.

30.     In order to invoke the procedures and remedies in Paragraph 29, any written notice of a dispute and request for negotiations under that Paragraph provided by Petitioners must be signed by authorized representatives of NRDC, NWF and NWEA.

## IX. Force Majeure

31.     The Parties recognize that performance of this Agreement is subject to fiscal and procurement laws and regulations of the United States which include, but are not limited to, the Anti-Deficiency Act, 31 U.S.C. § 1341, et seq. The possibility exists that circumstances outside the reasonable control of EPA could delay EPA's compliance with the deadlines, responsibilities or other expectations specified or contained in this

13

Agreement.  Such situations include, but are not limited to, a government shutdown; or

an extreme weather event that prevents EPA staff (or, in the case of matters addressed in

Paragraph 19, the NAS or SAB)  from meeting the deadlines, fulfilling the

responsibilities, or meeting the expectations specified or contained in this Agreement; or

a catastrophic environmental event that diverts EPA's staff resources away from meeting

the deadlines, fulfilling the responsibilities, or meeting the expectations specified or

contained in this Agreement.  Should a delay occur due to such circumstances, any

resulting failure by EPA to meet the responsibilities set forth herein shall not constitute a

failure to comply with the terms of this Agreement, and any deadlines (including the May

31, 2011 date for completion of the NAS and SAB reports) so affected shall be extended

one day for each day of the delay.  EPA will provide Petitioners with reasonable notice

and explanation for the delay (including an explanation of how EPAstaff assigned to the

VGP were affected by the event causing the delay) in the event that EPA invokes this

provision.  Any dispute regarding invocation of this provision, or the length of the

claimed delay, shall be resolved in accordance with the dispute resolution provision of

Paragraphs 29 and 30 of this Agreement.

## X.  Modifications

32.     If a subsequent change in law relieves EPA of its responsibilities

concerning matters addressed in this Agreement, then the Parties shall amend the

Agreement to conform to such changes.  Any dispute regarding invocation of this

provision shall be resolved in accordance with the dispute resolution provision of

Paragraphs 29 and 30 of this Agreement.

33.     The Parties may modify any deadline or other term of this Agreement in

writing.

## XI.  Agency Discretion

34.     Except as expressly provided herein, or in any subsequent amendment to

this Settlement Agreement, nothing in this Settlement Agreement shall be construed to

limit or modify the discretion accorded to EPA by the CWA, the Administrative

Procedure Act, or by any other law, including general principles of administrative law.

## XII. Notice

35.     All notices required or made with respect to this Agreement shall be in

writing and shall be effective, unless otherwise stated, on the date that notice is delivered

by an overnight mail/delivery service.  For any matter relating to this Agreement, the

contact persons for Petitioners and EPA are:

For Petitioner, NRDC:

Thomas Cmar
Natural Resources Defense Council, Inc.
2 N. Riverside, Ste. 2250
Chicago, IL 60606

For Petitioner NWF:

Neil S. Kagan
National Wildlife Federation
213 West Liberty Street, Suite 200
Ann Arbor, MI 48104-1398

For Petitioner NWEA.:

Allison LaPlante
Staff Attorney & Clinical Professor
Pacific Environmental Advocacy Center
at Lewis & Clark Law School
10015 SW Terwilliger Blvd
Portland, OR  97219-7799

For EPA:

Associate General Counsel, Water Law Office
Office of General Counsel (2355)
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, DC  20460

Chief
Environmental Defense Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, D.C.  20026-3986

36.     Upon written notice to the other Parties, any Party may designate a

successor contact person for any matter relating to this Agreement.

### XIII. Representative Authority

37.     Each undersigned representative of the Parties certifies that he or she is

fully authorized by the Party to enter into, execute, and bind such Party to this

Agreement.

### XIV. Mutual Drafting

38.     This Agreement was negotiated between EPA and Petitioners and jointly

drafted by the Parties.  Accordingly, the Parties hereby agree that any and all rules of

construction to the effect that ambiguity is construed against the drafting Party shall be

inapplicable in any dispute concerning the terms, meaning, or interpretation of this

Agreement.

### XV. Counterparts

39.     This Agreement may be executed in any number of counterpart originals,

each of which shall be deemed to constitute an original Agreement, and all of which shall

16

constitute one Agreement.  The execution of one counterpart by any Party shall have the

same force and effect as if that Party had signed all other counterparts.

## XVI. Use of Settlement Agreement

40.     This Agreement shall not constitute an admission or evidence of any fact,

wrongdoing, misconduct, or liability on the part of any Party.

## XVII. Compliance with Other Laws

41.     No provision of this Agreement shall be interpreted as or constitute a

commitment or requirement that EPA obligate or pay funds in contravention of the Anti-

Deficiency Act, 31 U.S.C. § 1341, or take any action in contravention of the APA, the

CWA, or any other law or regulation, either substantive or procedural.

## XVIII. Applicable Law

42.     This Agreement shall be governed by and construed under the laws of the

United States.

## XIX. Third Party Beneficiaries

43.     Nothing in this Agreement shall be construed to make any other person or

entity not executing this Agreement a third-party beneficiary to this Agreement.

44.     The Parties consent to the form and substance of the foregoing Agreement.

## XX. Attorneys' Fees

45.     The United States shall pay, no later than 45 days after final execution of

this agreement, (1) $64,672 to NWEA; (2) $20,408 to NWF; and (3) $37,390 to NRDC,

by electronic funds transfer in accordance with instructions provided to EPA's counsel by

counsel for each such party. Any obligation of the United States to expend funds under

this Settlement Agreement are subject to the availability of appropriations in accordance

with the Anti-Deficiency Act, 31 U.S.C. § 1341, and this Settlement Agreement shall not

be construed to require the United States to obligate or pay funds in contravention of said

Act. NWEA, NWF, and NRDC each agrees that payment pursuant to this paragraph will

constitute full and final payment of all costs of litigation (including reasonable attorneys'

fees) incurred by such party in connection with these consolidated cases.. Upon payment,

each such party releases the United States, including EPA, from any claims regarding

such fees and costs in connection with these consolidated cases. Nothing in this

agreement shall be construed to waive any right NWEA, NWF, or NRDC may have to

seek attorneys' fees for any costs of litigation associated with any reactivation of

litigation pursuant to paragraph 29 of this Agreement and nothing in this agreement shall

be construed to limit the United States right to oppose any such claims.


DATE: March 4, 2011

MARTIN F. MCDERMOTT
United States Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, D.C. 20026-3986
(202)514-4122

*Counsel for EPA*


DATE: March 3, 2011

THOMAS CMAR
Natural Resources Defense Council, Inc.
2 N. Riverside, Ste. 2250
Chicago, IL 60606
(312)651-7906

*Counsel for NRDC*

DATE: 03/03/2011

_____

NEIL S. KAGAN
National Wildlife Federation
213 West Liberty Street, Suite 200
Ann Arbor, MI 48104-1398
(734)887-7106

_Counsel for NWF_

DATE: _____

_____

ALLISON LAPLANTE
Staff Attorney & Clinical Professor
Pacific Environmental Advocacy Center
    at Lewis & Clark Law School
10015 SW Terwilliger Blvd
Portland, OR  97219-7799
(503)768-6894

_Counsel for NWEA_

19

DATE: _____

NEIL S. KAGAN
National Wildlife Federation
213 West Liberty Street, Suite 200
Ann Arbor, MI 48104-1398
(734)887-7106

*Counsel for NWF*


DATE: 3/3/11

ALLISON LAPLANTE
Staff Attorney & Clinical Professor
Pacific Environmental Advocacy Center
    at Lewis & Clark Law School
10015 SW Terwilliger Blvd
Portland, OR  97219-7799
(503)768-6894

*Counsel for NWEA*

19

## ATTACHMENT A

*§ XXX – Modification of the VGP:* This permit is subject to modification in accordance with 40 CFR 124.5 and 122.62. Grounds for such modification include receipt of new information that was not available at the time of permit issuance (other than revised regulations, guidance, or test methods) and would have justified the application of different permit conditions at the time of permit issuance.  With respect to ballast water discharges, new information that will be considered in determining whether to modify this permit includes, but is not limited to, data or information from permittees, the general public, states, academia, scientific or technical articles or studies, and results of monitoring conducted under this permit indicating that:

- Treatment technology has improved such that these improved technologies would have justified the application of significantly more stringent effluent limitations or other permit conditions had they been known at the time of permit issuance;

- Treatment technologies known of at the time of permit issuance perform significantly better than understood at the time of permit issuance such that this improved performance would have justified the application of significantly more stringent effluent limitations or other permit conditions had this been understood at the time of permit issuance;

- Scientific understanding of pollutant effects or of invasion biology has evolved such that this new information would have justified the application of significantly more stringent effluent limitations or other permit conditions had this been understood of at the time of permit issuance; or

- The cumulative effects of any discharge authorized by the VGP on the environment are unacceptable.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL WILDLIFE FEDERATION,

        Plaintiff,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

        Defendant,

and

LAKE CARRIERS' ASSOCIATION AND
CANADIAN SHIPOWNERS ASSOCIATION,

        Intervenor-Defendants.

Civil Action No. 1:13-cv-00617 (CKK)

---

**INTERVENOR-DEFENDANTS LAKE CARRIERS' ASSOCIATION
AND CANADIAN SHIPOWNERS ASSOCIATION'S
STATEMENT OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR
A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

# EXHIBIT 2



**NATIONAL WILDLIFE FEDERATION®**
Great Lakes Regional Center®

April 30, 2013

VIA FACSIMILE

The Honorable Thomas J. McNamara
Acting Justice of the Supreme Court
Albany County Supreme Court
Fax: (518) 487-5020

Re: *National Wildlife Federation v. Martens*, Index No. 6181-12

Dear Justice McNamara:

On April 12, 2013, Mr. Rappoport wrote to you on behalf of the New York State
Department of Environmental Conservation ("the Department"). He wrote to inform you that the
U.S. Environmental Protection Agency ("EPA") published notice of the Vessel General Permit
("VGP") in the *Federal Register* on April 12th. 78 Fed. Reg. 21938 (Apr. 12, 2013). The VGP
became final on April 26, 2013, pursuant to 40 C.F.R. § 23.2(a).

Upon filing the petition in this matter challenging the Department's certification of the
VGP, the National Wildlife Federation ("NWF") informed this Court that it was seeking an
expedited decision. NWF explained that it was concerned about the action the Department might
take if EPA were to issue the VGP before this Court were to rule. NWF was concerned that the
Department might seek dismissal on the ground of mootness based on EPA's application of a
regulation codified at 40 C.F.R. § 124.55(b) ("the Regulation"). The Regulation provides that
EPA will exclude any modifications adding conditions to a certification received after the agency
takes final action on a permit, even if a state court finds such additional conditions necessary to
comply with state water quality standards.

I am writing now to inform the Court that NWF has carefully studied the law, and that
NWF does not consider that this case will be moot as a result of the Regulation. A ruling in a
similar case by the Minnesota Court of Appeals to the contrary was wrong and, of course, is not
binding on this Court. *See U.S. Environmental Protection Agency (USEPA) Vessel General
Permit for Discharges Incidental to the Normal Operation of Commercial Vessels*, No. A08-
2196, 2009 WL 2998058, (Minn. App. Sep. 22, 2009). NWF will oppose any motion to dismiss
this matter as moot based upon the Regulation.

Section 401 of the Clean Water Act, 33 U.S.C. § 1341, recognizes the State of New York
as the sole authority regarding the content of certifications. To the extent that the Regulation
negates the State's authority to determine that content through the process of judicial review, it is
invalid and was void from its inception.

625 South State Street, 745 Legal Research, Ann Arbor, Michigan 48109
Ph 734-763-7087  kagan@nwf.org

Yours truly,

Neil S. Kagan

Cc (by email only):     Lawrence Rappoport
                        Timothy Hoffman
                        Scott Crisafulli
                        Gregory Fontaine
                        Matthew Melewski
                        John Marwell
                        Megan K. Collins

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL WILDLIFE FEDERATION,

          Plaintiff,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

          Defendant,

and

LAKE CARRIERS' ASSOCIATION AND
CANADIAN SHIPOWNERS ASSOCIATION,

          Intervenor-Defendants.

Civil Action No. 1:13-cv-00617 (CKK)

## INTERVENOR-DEFENDANTS LAKE CARRIERS' ASSOCIATION
## AND CANADIAN SHIPOWNERS ASSOCIATION'S
## STATEMENT OF POINTS AND AUTHORITIES
## IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR
## A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# EXHIBIT 3



**NATIONAL WILDLIFE FEDERATION®**
**Great Lakes Regional Center®**

May 1, 2013

VIA FACSIMILE & FIRST-CLASS MAIL

The Honorable Thomas J. McNamara
Acting Justice of the Supreme Court
Albany County Courthouse
16 Eagle Street
Albany, New York 12207
Fax: (518) 487-5020

   Re: *National Wildlife Federation v. Martens*, Index No. 6181-12

Dear Justice McNamara:

   Yesterday, the Intervenor-Defendants Lake Carriers' Association and Canadian Shipowners Association submitted a letter to you that, on its face, asks this Court to dismiss this matter as moot. Plaintiff National Wildlife Federation's understanding is that any such request must be made by motion to this Court in accordance with CPLR Rules 3211 & 7804 and Third Judicial District Rules regarding motion practice. Plaintiff thus respectfully requests that this Court decline to entertain Intervenor-Defendants' request unless and until it submits an appropriate motion and Plaintiff has a full and fair opportunity to be heard.

       Yours truly,

       Neil S. Kagan

Cc (by email only):  Lawrence Rappoport
       Timothy Hoffman
       Scott Crisafulli
       Gregory Fontaine
       Matthew Melewski
       John Marwell
       Megan K. Collins

625 South State Street, 745 Legal Research, Ann Arbor, Michigan 48109
Ph 734-763-7087  kagan@nwf.org

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL WILDLIFE FEDERATION,

               Plaintiff,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

               Defendant,

and

LAKE CARRIERS' ASSOCIATION AND
CANADIAN SHIPOWNERS ASSOCIATION,

               Intervenor-Defendants.

Civil Action No. 1:13-cv-00617 (CKK)

---

**INTERVENOR-DEFENDANTS LAKE CARRIERS' ASSOCIATION
AND CANADIAN SHIPOWNERS ASSOCIATION'S
STATEMENT OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR
A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

# EXHIBIT 4



NATIONAL
WILDLIFE
FEDERATION

"The conservation
interests can get
what they need
if they will pull
together."

**2011 Annual Report**



# Contents

**1** Message from the President And Chair

**2** GO6Ompg Campaign to End America's
Oil Dependence

**4** NWF Hosts NASA/Eco-Schools USA Climate Change
Connections Professional Development Institute

**6** Hundreds of Volunteers Unite to Restore
Coastal Alabama

**8** Minority Landowners Work to Revive the Legendary
Longleaf Pine

**10** Alaska Youth Lobby Congress to Protect
the Bristol Bay

**12** Bison Allowed to Roam Free Outside of Yellowstone

**14** NWF Launches its First Spanish-Language
TV Series for Children

**16** Making Way for Wildlife in Vermont

**18** Northern Cheyenne Tribe Goes Solar to Fight
Climate Change

**20** Maryland Board of Education Votes in Favor of
Environmental Education

**22** 7th Annual Great American Backyard Campout
Unites Citizens from Across the Nation

**24** J.Crew Partners with NWF to Support Protections
for Gulf Wildlife

**26** NWF Mobilizes Grassroots Action to Halt Activity
on Keystone XL Pipeline

**28** Oil Spill Disaster in the Yellowstone River Hits
Home for NWF

**30** Two-Year Effort Wins Community Wildlife Habitat™
Certification for Lake Norman

**32** Additional Highlights

**34** Affiliates and Regional Offices

**36** Financial Overview

**38** Invest in Wildlife's Future

**40** Volunteer Leadership, Executive Staff and
Corporate Partners





# Financial Overview

*The organization's consolidated statement of activities includes the results of the operations of National Wildlife Federation and related organization National Wildlife Federation Endowment, Inc.*

## Funding

In fiscal year 2011, National Wildlife Federation revenues totaled $107 million, with 67 percent coming from supporters through memberships, publications and catalog. Of this, $43 million in donations and bequests came from generous individual donors including our members, Guardians of the Wild, Leaders Club, the J.N. "Ding" Darling Circle, and members of our bequest legacy program, the Legacy Society.

Foundations, corporations and government provided one hundred and seventy nine grants for National Wildlife Federation's conservation and education programs totaling $23 million.

Major foundation grants were awarded by Charles Stewart Mott Foundation, Doris Duke Charitable Foundation, Energy Foundation, Ford Foundation, Great Lakes Fishery Trust, Houston Endowment, Inc., National Fish and Wildlife Foundation, The

Kendeda Fund, The Kresge Foundation, The McKnight Foundation, RenaissanceRe Risk Sciences Foundation, Inc., Town Creek Foundation, The Walton Family Foundation, William and Flora Hewlett Foundation, and anonymous donors.

Revenues generated by National Wildlife Federation's publications and films totaled $19 million and Nature Education Materials' revenue totaled $10 million. Gain on investment income totaled $7 million and royalties and other income yielded $5 million.

## Supporting Services

General, administrative and fund-raising expenses, which support National Wildlife Federation's conservation mission, totaled only 21 percent of total expenses for 2011.

## Transformational Leadership Work

NWF recently received leadership development grants from the Packard Foundation, Quixote Foundation and Surdna Foundation to develop and deliver leadership development initiatives. Such support has been critical in creating innovative leadership development programs for NWF staff and young leaders.

NWF is committed to developing staff and volunteer leaders who act as movement-building leaders, effectively engaging a diversity of stakeholders in achieving the mission. NWF invests in developing and sustaining key leaders who effectively lead in times of great change through self awareness, collaboration, coaching, bridge-building across diverse cultures and strategic risk taking.

One key to NWF's success in the next 75 years is to ensure there is strong leadership to continue to grow and strengthen the conservation movement in future years. We are building pathways for young professionals, ages 21–35, to be leaders within NWF, our state affiliates, and the broader conservation movement. Emerging leaders in this age group have the energy and new ideas that can both revolutionize the environmental/conservation movement of today and tomorrow. NWF's Emerging Leaders Initiative engages, empowers and expands a national network of young professional leaders, ages 21–35, who want to live in a healthy world where they can breathe clean air, drink clean water and enjoy a diverse array of wildlife and natural areas.

## Consolidated Statements of Activities

For the Year Ended August 31, 2011 ($in thousands)

| REVENUE | FY 2011 Total |
|---|---|
| Contributions from individuals | $43,357 |
| Contributions from foundations & corporations | $22,995 |
| Publications | $18,713 |
| Nature educations materials | $9,616 |
| Other | $12,747 |
| **Total Revenue** | **$107,428** |
| **EXPENSE** | |
| **CONSERVATION EDUCATION PROGRAMS** | |
| Conservation advocacy programs | $33,918 |
| Education outreach and publications | $23,338 |
| Other nature education programs | $10,289 |
| Membership education programs | $12,946 |
| **Total program expense** | **$80,491** |
| **SUPPORT SERVICES** | |
| Fund raising | $12,247 |
| General and administrative | $9,160 |
| Total support service expense | $21,407 |
| **Total expense** | **$101,898** |
| **CHANGE IN NET ASSETS BEFORE GAINS** | **$5,530** |
| Other gains | $2,042 |
| **CHANGE IN NET ASSETS** | **$7,572** |
| **NET ASSETS, BEGINNING OF THE YEAR** | **$40,641** |
| **NET ASSETS, END OF YEAR** | **$48,213** |



**2011 REVENUE**

Individuals 40%
Foundations and corporations 21%
Publications 18%
Nature education materials 9%
Other 12%

**2011 EXPENSE**

Conservation education programs 79%
Support services 21%